# FISHER ET AL. *v.* UNITED STATES ET AL.

No. 74–18.  Argued November 3, 1975—Decided April 21, 1976*

---

*Together with No. 74–611, *United States et al.* v. *Kasmir et al.*, on certiorari to the United States Court of Appeals for the Fifth Circuit.

392

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. BRENNAN, J., *post*, p. 414, and MARSHALL, J., *post*, p. 430, filed opinions concurring in the judgment. STEVENS, J., took no part in the consideration or decision of the cases.

*Richard L. Bazelon* argued the cause for petitioners in No. 74–18. With him on the brief was *Solomon Fisher*. *Deputy Solicitor General Wallace* argued the cause for petitioners in No. 74–611 and respondents in No. 74–18. With him on the briefs were *Solicitor General Bork, Assistant Attorney General Crampton, Stuart A. Smith,* and *Robert E. Lindsay*. *Robert E. Goodfriend* argued the cause for respondents in No. 74–611. With him on the brief were *Edward A. Copley* and *Cyril D. Kasmir*.†

MR. JUSTICE WHITE delivered the opinion of the Court.

In these two cases we are called upon to decide whether a summons directing an attorney to produce documents delivered to him by his client in connection with the attorney-client relationship is enforceable over claims that the documents were constitutionally immune from summons in the hands of the client and retained that immunity in the hands of the attorney.

I

In each case, an Internal Revenue agent visited the taxpayer or taxpayers[1] and interviewed them in con-

_____

†*Stanley H. Stearman* filed a brief for the National Society of Public Accountants as *amicus curiae* urging affirmance in No. 74–611. *Richard H. Appert, Louis Bender, Michael I. Saltzman,* and *James D. Fellers* filed a brief for the American Bar Association as *amicus curiae* in both cases.

[1] In No. 74–18, the taxpayers are husband and wife who filed a joint return. In No. 74–611, the taxpayer filed an individual return.

nection with an investigation of possible civil or criminal liability under the federal income tax laws. Shortly after the interviews—one day later in No. 74–611 and a week or two later in No. 74–18—the taxpayers obtained from their respective accountants certain documents relating to the preparation by the accountants of their tax returns. Shortly after obtaining the documents—later the same day in No. 74–611 and a few weeks later in No. 74–18—the taxpayers transferred the documents to their lawyers—respondent Kasmir and petitioner Fisher, respectively—each of whom was retained to assist the taxpayer in connection with the investigation. Upon learning of the whereabouts of the documents, the Internal Revenue Service served summonses on the attorneys directing them to produce documents listed therein. In No. 74–611, the documents were described as "the following records of Tannebaum Bindler & Lewis [the accounting firm].

"1. Accountant's work papers pertaining to Dr. E. J. Mason's books and records of 1969, 1970 and 1971.[2]

"2. Retained copies of E. J. Mason's income tax returns for 1969, 1970 and 1971.

"3. Retained copies of reports and other correspondence between Tannebaum Bindler & Lewis and Dr. E. J. Mason during 1969, 1970 and 1971."

In No. 74–18, the documents demanded were analyses by the accountant of the taxpayers' income and expenses which had been copied by the accountant from the taxpayers' canceled checks and deposit receipts.[3] In No.

---

[2] The "books and records" concerned the taxpayer's large medical practice.

[3] The husband taxpayer's checks and deposit receipts related to his textile waste business. The wife's related to her women's wear shop.

74–611, a summons was also served on the accountant directing him to appear and testify concerning the documents to be produced by the lawyer. In each case, the lawyer declined to comply with the summons directing production of the documents, and enforcement actions were commenced by the Government under 26 U. S. C. §§ 7402 (b) and 7604 (a). In No. 74–611, the attorney raised in defense of the enforcement action the taxpayer's accountant-client privilege, his attorney-client privilege, and his Fourth and Fifth Amendment rights. In No. 74–18, the attorney claimed that enforcement would involve compulsory self-incrimination of the taxpayers in violation of their Fifth Amendment privilege, would involve a seizure of the papers without necessary compliance with the Fourth Amendment, and would violate the taxpayers' right to communicate in confidence with their attorney. In No. 74–18 the taxpayers intervened and made similar claims.

In each case the summons was ordered enforced by the District Court and its order was stayed pending appeal. In No. 74–18, 500 F. 2d 683 (CA3 1974), petitioners' appeal raised, in terms, only their Fifth Amendment claim, but they argued in connection with that claim that enforcement of the summons would involve a violation of the taxpayers' reasonable expectation of privacy and particularly so in light of the confidential relationship of attorney to client. The Court of Appeals for the Third Circuit after reargument en banc affirmed the enforcement order, holding that the taxpayers had never acquired a possessory interest in the documents and that the papers were not immune in the hands of the attorney. In No. 74–611, a divided panel of the Court of Appeals for the Fifth Circuit reversed the enforcement order, 499 F. 2d 444 (1974). The court reasoned that by virtue of the Fifth Amendment the documents would have been privileged

from production pursuant to summons directed to the taxpayer had he retained possession and, in light of the confidential nature of the attorney-client relationship, the taxpayer retained, after the transfer to his attorney, "a legitimate expectation of privacy with regard to the materials he placed in his attorney's custody, that he retained constructive possession of the evidence, and thus . . . retained Fifth Amendment protection."[4] *Id.,* at 453. We granted certiorari to resolve the conflict created. 420 U. S. 906 (1975). Because in our view the documents were not privileged either in the hands of the lawyers or of their clients, we affirm the judgment of the Third Circuit in No. 74–18 and reverse the judgment of the Fifth Circuit in No. 74–611.

## II

All of the parties in these cases and the Court of Appeals for the Fifth Circuit have concurred in the proposition that if the Fifth Amendment would have excused a *taxpayer* from turning over the accountant's papers had he possessed them, the *attorney* to whom they are delivered for the purpose of obtaining legal advice should also be immune from subpoena. Although we agree with this proposition for the reasons set forth in Part III, *infra,* we are convinced that, under our decision in *Couch* v. *United States,* 409 U. S. 322 (1973), it is not the taxpayer's Fifth Amendment privilege that would excuse the *attorney* from production.

The relevant part of that Amendment provides:

> "No person . . . shall be *compelled* in any criminal case to be a *witness against himself.*" (Emphasis added.)

---

[4] The respondents in No. 74–611 did not, in terms, rely on the attorney-client privilege or the Fourth Amendment before the Court of Appeals.

The taxpayer's privilege under this Amendment is not violated by enforcement of the summonses involved in these cases because enforcement against a taxpayer's lawyer would not "compel" the taxpayer to do any-thing—and certainly would not compel him to be a "witness" against himself. The Court has held repeat-edly that the Fifth Amendment is limited to prohibiting the use of "physical or moral compulsion" exerted on the person asserting the privilege, *Perlman* v. *United States,* 247 U. S. 7, 15 (1918); *Johnson* v. *United States,* 228 U. S. 457, 458 (1913); *Couch* v. *United States, supra,* at 328, 336. See also *Holt* v. *United States,* 218 U. S. 245, 252–253 (1910); *United States* v. *Dionisio,* 410 U. S. 1 (1973); *Schmerber* v. *California,* 384 U. S. 757, 765 (1966); *Burdeau* v. *McDowell,* 256 U. S. 465, 476 (1921); *California Bankers Assn.* v. *Shultz,* 416 U. S. 21, 55 (1974). In *Couch* v. *United States, supra,* we recently ruled that the Fifth Amendment rights of a taxpayer were not violated by the enforcement of a documentary summons directed to her accountant and requiring pro-duction of the taxpayer's own records in the possession of the accountant. We did so on the ground that in such a case "the ingredient of personal compulsion against an accused is lacking." 409 U. S., at 329.

Here, the taxpayers are compelled to do no more than was the taxpayer in *Couch.* The taxpayers' Fifth Amendment privilege is therefore not violated by enforce-ment of the summonses directed toward their attorneys. This is true whether or not the Amendment would have barred a subpoena directing the taxpayer to produce the documents while they were in his hands.

The fact that the attorneys are agents of the taxpayers does not change this result. *Couch* held as much, since the accountant there was also the taxpayer's agent, and in this respect reflected a longstanding view. In

*Hale* v. *Henkel,* 201 U. S. 43, 69–70 (1906), the Court said that the privilege "was never intended to permit [a person] to plead the fact that some third person might be incriminated by his testimony, even though he were the agent of such person . . . . [T]he Amendment is limited to a person who shall be compelled in any criminal case to be a witness against *himself.*" (Emphasis in original.) "It is extortion of information from the accused himself that offends our sense of justice." *Couch* v. *United States, supra,* at 328. Agent or no, the lawyer is not the taxpayer. The taxpayer is the "accused," and nothing is being extorted from him.

Nor is this one of those situations, which *Couch* suggested might exist, where constructive possession is so clear or relinquishment of possession so temporary and insignificant as to leave the personal compulsion upon the taxpayer substantially intact. 409 U. S., at 333. In this respect we see no difference between the delivery to the attorneys in these cases and delivery to the accountant in the *Couch* case. As was true in *Couch,* the documents sought were obtainable without personal compulsion on the accused.

Respondents in No. 74–611 and petitioners in No. 74–18 argue, and the Court of Appeals for the Fifth Circuit apparently agreed, that if the summons was enforced, the taxpayers' Fifth Amendment privilege would be, but should not be, lost solely because they gave their documents to their lawyers in order to obtain legal advice. But this misconceives the nature of the constitutional privilege. The Amendment protects a person from being compelled to be a witness against himself. Here, the taxpayers retained any privilege they ever had not to be compelled to testify against themselves and not to be compelled themselves to produce private papers in their possession. *This* personal privilege was in no way decreased by the transfer. It is simply that by

reason of the transfer of the documents to the attorneys, those papers may be subpoenaed without compulsion on the taxpayer. The protection of the Fifth Amendment is therefore not available. "A party is privileged from producing evidence but not from its production." *Johnson* v. *United States, supra,* at 458.

The Court of Appeals for the Fifth Circuit suggested that because legally and ethically the attorney was required to respect the confidences of his client, the latter had a reasonable expectation of privacy for the records in the hands of the attorney and therefore did not forfeit his Fifth Amendment privilege with respect to the records by transferring them in order to obtain legal advice. It is true that the Court has often stated that one of the several purposes served by the constitutional privilege against compelled testimonial self-incrimination is that of protecting personal privacy. See, *e. g., Murphy* v. *Waterfront Comm'n,* 378 U. S. 52, 55 (1964); *Couch* v. *United States, supra,* at 332, 335–336; *Tehan* v. *United States ex rel. Shott,* 382 U. S. 406, 416 (1966); *Davis* v. *United States,* 328 U. S. 582, 587 (1946). But the Court has never suggested that every invasion of privacy violates the privilege. Within the limits imposed by the language of the Fifth Amendment, which we necessarily observe, the privilege truly serves privacy interests; but the Court has never on any ground, personal privacy included, applied the Fifth Amendment to prevent the otherwise proper acquisition or use of evidence which, in the Court's view, did not involve compelled testimonial self-incrimination of some sort.[5]

---

[5] There is a line of cases in which the Court stated that the Fifth Amendment was offended by the use in evidence of documents or property seized in violation of the Fourth Amendment. *Gouled* v. *United States,* 255 U. S. 298, 306 (1921); *Agnello* v. *United States,* 269 U. S. 20, 33–34 (1925); *United States* v. *Lefkowitz,* 285 U. S. 452, 466–467 (1932); *Mapp* v. *Ohio,* 367 U. S. 643, 661 (1961) (Black,

The proposition that the Fifth Amendment protects private information obtained without compelling self-incriminating testimony is contrary to the clear statements of this Court that under appropriate safeguards private incriminating statements of an accused may be overheard and used in evidence, if they are not compelled at the time they were uttered, *Katz* v. *United States,* 389 U. S. 347, 354 (1967); *Osborn* v. *United States,* 385 U. S. 323, 329–330 (1966); and *Berger* v. *New York,* 388 U. S. 41, 57 (1967); cf. *Hoffa* v. *United States,* 385 U. S. 293, 304 (1966); and that disclosure of private information may be compelled if immunity removes the risk of incrimination. *Kastigar* v. *United States,* 406 U. S. 441 (1972). If the Fifth Amendment protected generally against the obtaining of private information from a man's mouth or pen or house, its protections would presumably not be lifted by probable cause and a warrant or by immunity. The privacy invasion is not mitigated by immunity; and the Fifth Amendment's strictures, unlike the Fourth's, are not removed by showing reasonableness. The Framers addressed the subject of personal privacy directly in the Fourth Amendment. They struck a balance so that when the State's reason to believe incriminating evidence will be found becomes sufficiently great, the invasion of privacy becomes justified and a warrant to search and seize will issue. They did not seek in still another Amendment—the Fifth—to achieve a general protection of privacy but to deal with the more specific issue of compelled self-incrimination.

J., concurring). But the Court purported to find elements of compulsion in such situations. "In either case he is the unwilling source of the evidence, and the Fifth Amendment forbids that he shall be compelled to be a witness against himself in a criminal case." *Gouled* v. *United States, supra,* at 306. In any event the predicate for those cases, lacking here, was a violation of the Fourth Amendment. Cf. *Burdeau* v. *McDowell,* 256 U. S. 465, 475–476 (1921).

We cannot cut the Fifth Amendment completely loose from the moorings of its language, and make it serve as a general protector of privacy—a word not mentioned in its text and a concept directly addressed in the Fourth Amendment. We adhere to the view that the Fifth Amendment protects against "compelled self-incrimination, not [the disclosure of] private information." *United States* v. *Nobles,* 422 U. S. 225, 233 n. 7 (1975).

Insofar as private information not obtained through compelled self-incriminating testimony is legally protected, its protection stems from other sources [6]—the Fourth Amendment's protection against seizures without warrant or probable cause and against subpoenas which suffer from "too much indefiniteness or breadth in the things required to be 'particularly described,'" *Oklahoma Press Pub. Co.* v. *Walling,* 327 U. S. 186, 208 (1946); *In re Horowitz,* 482 F. 2d 72, 75–80 (CA2 1973) (Friendly, J.); the First Amendment, see *NAACP* v. *Alabama,* 357 U. S. 449, 462 (1958); or evidentiary privileges such as the attorney-client privilege.[7]

---

[6] In *Couch* v. *United States,* 409 U. S. 322 (1973), on which taxpayers rely for their claim that the Fifth Amendment protects their "legitimate expectation of privacy," the Court differentiated between the things protected by the Fourth and Fifth Amendments. "We hold today that no Fourth or Fifth Amendment claim can prevail where, as in this case, there exists no legitimate expectation of privacy and no semblance of governmental compulsion against the person of the accused." *Id.,* at 336.

[7] The taxpayers and their attorneys have not raised arguments of a Fourth Amendment nature before this Court and could not be successful if they had. The summonses are narrowly drawn and seek only documents of unquestionable relevance to the tax investigation. Special problems of privacy which might be presented by subpoena of a personal diary, *United States* v. *Bennett,* 409 F. 2d 888, 897 (CA2 1969) (Friendly, J.), are not involved here.

First Amendment values are also plainly not implicated in these cases.

## III

Our above holding is that compelled production of documents from an attorney does not implicate whatever Fifth Amendment privilege the taxpayer might have enjoyed from being compelled to produce them himself. The taxpayers in these cases, however, have from the outset consistently urged that they should not be forced to expose otherwise protected documents to summons simply because they have sought legal advice and turned the papers over to their attorneys. The Government appears to agree unqualifiedly. The difficulty is that the taxpayers have erroneously relied on the Fifth Amendment without urging the attorney-client privilege in so many words. They have nevertheless invoked the relevant body of law and policies that govern the attorney-client privilege. In this posture of the case, we feel obliged to inquire whether the attorney-client privilege applies to documents in the hands of an attorney which would have been privileged in the hands of the client by reason of the Fifth Amendment.[8]

---

[8] Federal Rule Evid. 501, effective January 2, 1975, provides that with respect to privileges the United States district courts "shall be governed by the principles of the common law . . . interpreted . . . in the light of reason and experience." Thus, whether or not Rule 501 applies to this case, the attorney-client privilege issue is governed by the principles and authorities discussed and cited *infra*. Fed. Rule Crim. Proc. 26.

In No. 74–611, the taxpayer did not intervene, and his rights have been asserted only through his lawyer. The parties disagree on the question whether an attorney may claim the Fifth Amendment privilege of his client. We need not resolve this question. The only privilege of the taxpayer involved here is the attorney-client privilege, and it is universally accepted that the attorney-client privilege may be raised by the attorney, C. McCormick, Evidence § 92, p. 193, § 94, p. 197 (2d ed. 1972) (hereinafter McCormick); *Republic Gear Co.* v. *Borg-Warner Corp.*, 381 F. 2d 551 (CA2 1967); *Bouschor* v. *United States*, 316 F. 2d 451 (CA8 1963); *Colton* v.

Confidential disclosures by a client to an attorney made in order to obtain legal assistance are privileged. 8 J. Wigmore, Evidence § 2292 (McNaughton rev. 1961) (hereinafter Wigmore); McCormick § 87, p. 175. The purpose of the privilege is to encourage clients to make full disclosure to their attorneys. 8 Wigmore § 2291, and § 2306, p. 590; McCormick § 87, p. 175, § 92, p. 192; *Baird* v. *Koerner,* 279 F. 2d 623 (CA9 1960); *Modern Woodmen of America* v. *Watkins,* 132 F. 2d 352 (CA5 1942); *Prichard* v. *United States,* 181 F. 2d 326 (CA6), aff'd *per curiam,* 339 U. S. 974 (1950); *Schwimmer* v. *United States,* 232 F. 2d 855 (CA8 1956); *United States* v. *Goldfarb,* 328 F. 2d 280 (CA6 1964). As a practical matter, if the client knows that damaging information could more readily be obtained from the attorney following disclosure than from himself in the absence of disclosure, the client would be reluctant to confide in his lawyer and it would be difficult to obtain fully informed legal advice. However, since the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose. Accordingly it protects only those disclosures—necessary to obtain informed legal advice—which might not have been made absent the privilege. *In re Horowitz, supra,* at 81 (Friendly, J.); *United States* v. *Goldfarb, supra;* 8 Wigmore § 2291, p. 554; McCormick § 89, p. 185. This Court and the lower courts have thus uniformly held that pre-existing documents which could have been obtained by court process from the client when he was in possession may also be obtained from the attorney by similar process following transfer by the client in order

*United States,* 306 F. 2d 633 (CA2 1962); *Schwimmer* v. *United States,* 232 F. 2d 855 (CA8), cert. denied, 352 U. S. 833 (1956); *Baldwin* v. *Commissioner,* 125 F. 2d 812 (CA9 1942).

to obtain more informed legal advice. *Grant* v. *United States,* 227 U. S. 74, 79–80 (1913); 8 Wigmore § 2307, and cases there cited; McCormick § 90, p. 185; *Falsone* v. *United States,* 205 F. 2d 734 (CA5 1953); *Sovereign Camp, W. O. W.* v. *Reed,* 208 Ala. 457, 94 So. 910 (1922); *Andrews* v. *Mississippi R. Co.,* 14 Ind. 169, 98 N. E. 49 (1860); *Palatini* v. *Sarian,* 15 N. J. Super. 34, 83 A. 2d 24 (1951); *Pearson* v. *Yoder,* 39 Okla. 105, 134 P. 421 (1913); *State ex rel Sowers* v. *Olwell,* 64 Wash. 2d 828, 394 P. 2d 681 (1964). The purpose of the privilege requires no broader rule. Pre-existing documents obtainable from the client are not appreciably easier to obtain from the attorney after transfer to him. Thus, even absent the attorney-client privilege, clients will not be discouraged from disclosing the documents to the attorney, and their ability to obtain informed legal advice will remain unfettered. It is otherwise if the documents are not obtainable by subpoena *duces tecum* or summons while in the exclusive possession of the client, for the client will then be reluctant to transfer possession to the lawyer unless the documents are also privileged in the latter's hands. Where the transfer is made for the purpose of obtaining legal advice, the purposes of the attorney-client privilege would be defeated unless the privilege is applicable. "It follows, then, that *when the client himself would be privileged* from production of the document, either as a party at common law ... or as exempt from self-incrimination, the attorney having possession of the document is not bound to produce." 8 Wigmore § 2307, p. 592. Lower courts have so held. *Id.,* § 2307, p. 592 n. 1, and cases there cited; *United States* v. *Judson,* 322 F. 2d 460, 466 (CA9 1963); *Colton* v. *United States,* 306 F. 2d 633, 639 (CA2 1962). This proposition was accepted by the Court of Appeals for the Fifth Circuit below, is asserted by petitioners

in No. 74–18 and respondents in No. 74–611, and was conceded by the Government in its brief and at oral argument. Where the transfer to the attorney is for the purpose of obtaining legal advice, we agree with it.

Since each taxpayer transferred possession of the documents in question from himself to his attorney in order to obtain legal assistance in the tax investigations in question, the papers, if unobtainable by summons from the client, are unobtainable by summons directed to the attorney by reason of the attorney-client privilege. We accordingly proceed to the question whether the documents could have been obtained by summons addressed to the taxpayer while the documents were in his possession. The only bar to enforcement of such summons asserted by the parties or the courts below is the Fifth Amendment's privilege against self-incrimination. On this question the Court of Appeals for the Fifth Circuit in No. 74–611 is at odds with the Court of Appeals for the Second Circuit in *United States* v. *Beattie,* 522 F. 2d 267 (1975), cert. pending, Nos. 75–407, 75–700.

## IV

The proposition that the Fifth Amendment prevents compelled production of documents over objection that such production might incriminate stems from *Boyd* v. *United States,* 116 U. S. 616 (1886). *Boyd* involved a civil forfeiture proceeding brought by the Government against two partners for fraudulently attempting to import 35 cases of glass without paying the prescribed duty. The partnership had contracted with the Government to furnish the glass needed in the construction of a Government building. The glass specified was foreign glass, it being understood that if part ,or all of the glass was furnished from the partnership's existing duty-paid in-

ventory, it could be replaced by duty-free imports. Pursuant to this arrangement, 29 cases of glass were imported by the partnership duty free. The partners then represented that they were entitled to duty-free entry of an additional 35 cases which were soon to arrive. The forfeiture action concerned these 35 cases. The Government's position was that the partnership had replaced all of the glass used in construction of the Government building when it imported the 29 cases. At trial, the Government obtained a court order directing the partners to produce an invoice the partnership had received from the shipper covering the previous 29-case shipment. The invoice was disclosed, offered in evidence, and used, over the Fifth Amendment objection of the partners, to establish that the partners were fraudulently claiming a greater exemption from duty than they were entitled to under the contract. This Court held that the invoice was inadmissible and reversed the judgment in favor of the Government. The Court ruled that the Fourth Amendment applied to court orders in the nature of subpoenas *duces tecum* in the same manner in which it applies to search warrants, *id.*, at 622; and that the Government may not, consistent with the Fourth Amendment, seize a person's documents or other property as evidence unless it can claim a proprietary interest in the property superior to that of the person from whom the property is obtained. *Id.*, at 623–624. The invoice in question was thus held to have been obtained in violation of the Fourth Amendment. The Court went on to hold that the accused in a criminal case or the defendant in a forfeiture action could not be forced to produce evidentiary items without violating the Fifth Amendment as well as the Fourth. More specifically, the Court declared, "a compulsory production of the private books and papers of the owner of goods sought to be forfeited ... is compelling him to be a witness against him-

self, within the meaning of the Fifth Amendment to the Constitution." *Id.*, at 634–635. Admitting the partnership invoice into evidence had violated both the Fifth and Fourth Amendments.

Among its several pronouncements, *Boyd* was understood to declare that the seizure, under warrant or otherwise, of any purely evidentiary materials violated the Fourth Amendment and that the Fifth Amendment rendered these seized materials inadmissible. *Gouled* v. *United States,* 255 U. S. 298 (1921); *Agnello* v. *United States,* 269 U. S. 20 (1925); *United States* v. *Lefkowitz,* 285 U. S. 452 (1932). That rule applied to documents as well as to other evidentiary items—"[t]here is no special sanctity in papers, as distinguished from other forms of property, to render them immune from search and seizure, if only they fall within the scope of the principles of the cases in which other property may be seized . . . ." *Gouled* v. *United States, supra,* at 309. Private papers taken from the taxpayer, like other "mere evidence," could not be used against the accused over his Fourth and Fifth Amendment objections.

Several of *Boyd*'s express or implicit declarations have not stood the test of time. The application of the Fourth Amendment to subpoenas was limited by *Hale* v. *Henkel,* 201 U. S. 43 (1906), and more recent cases. See, *e. g., Oklahoma Press Pub. Co.* v. *Walling,* 327 U. S. 186 (1946). Purely evidentiary (but "nontestimonial") materials, as well as contraband and fruits and instrumentalities of crime, may now be searched for and seized under proper circumstances, *Warden* v. *Hayden,* 387 U. S. 294 (1967).[9] Also, any notion that "testimonial" evidence may never be seized and used in evidence is

---

[9] Citing to *Schmerber* v. *California,* 384 U. S. 757 (1966), *Warden* v. *Hayden,* 387 U. S., at 302–303, reserved the question "whether there are items of evidential value whose very nature precludes them from being the object of a reasonable search and seizure."

inconsistent with *Katz* v. *United States,* 389 U. S. 347 (1967); *Osborn* v. *United States,* 385 U. S. 323 (1966); and *Berger* v. *New York,* 388 U. S. 41 (1967), approving the seizure under appropriate circumstances of conversations of a person suspected of crime. See also *Marron* v. *United States,* 275 U. S. 192 (1927).

It is also clear that the Fifth Amendment does not independently proscribe the compelled production of every sort of incriminating evidence but applies only when the accused is compelled to make a *testimonial* communication that is incriminating. We have, accordingly, declined to extend the protection of the privilege to the giving of blood samples, *Schmerber* v. *California,* 384 U. S. 757, 763–764 (1966);[10] to the giving of handwriting exemplars, *Gilbert* v. *California,* 388 U. S. 263, 265–267 (1967); voice exemplars, *United States* v. *Wade,* 388 U. S. 218, 222–223 (1967); or the donning of a blouse worn by the perpetrator, *Holt* v. *United States,* 218 U. S. 245 (1910). Furthermore, despite *Boyd,* neither a partnership nor the individual partners are shielded from compelled production of partnership records on self-incrimination grounds. *Bellis* v. *United States,* 417 U. S. 85 (1974). It would appear that under that case the precise claim sustained in *Boyd* would now be rejected for reasons not there considered.

The pronouncement in *Boyd* that a person may not be forced to produce his private papers has nonetheless often appeared as dictum in later opinions of this Court. See, *e. g., Wilson* v. *United States,* 221 U. S. 361, 377 (1911); *Wheeler* v. *United States,* 226 U. S. 478, 489 (1913); *United States* v. *White,* 322 U. S. 694, 698–699

---

[10] The Court's holding was: "Since the blood test evidence, although an incriminating product of compulsion, was neither petitioner's testimony nor evidence relating to some communicative act or writing by petitioner, it was not inadmissible on privilege grounds." 384 U. S., at 765.

(1944); *Davis* v. *United States,* 328 U. S., at 587–588; *Schmerber, supra,* at 763–764; *Couch* v. *United States,* 409 U. S., at 330; *Bellis* v. *United States, supra,* at 87. To the extent, however, that the rule against compelling production of private papers rested on the proposition that seizures of or subpoenas for "mere evidence," including documents, violated the Fourth Amendment and therefore also transgressed the Fifth, *Gouled* v. *United States, supra,* the foundations for the rule have been washed away. In consequence, the prohibition against forcing the production of private papers has long been a rule searching for a rationale consistent with the proscriptions of the Fifth Amendment against compelling a person to give "testimony" that incriminates him. Accordingly, we turn to the question of what, if any, incriminating testimony within the Fifth Amendment's protection, is compelled by a documentary summons.

A subpoena served on a taxpayer requiring him to produce an accountant's workpapers in his possession without doubt involves substantial compulsion. But it does not compel oral testimony; nor would it ordinarily compel the taxpayer to restate, repeat, or affirm the truth of the contents of the documents sought. Therefore, the Fifth Amendment would not be violated by the fact alone that the papers on their face might incriminate the taxpayer, for the privilege protects a person only against being incriminated by his own compelled testimonial communications. *Schmerber* v. *California, supra; United States* v. *Wade, supra;* and *Gilbert* v. *California, supra.* The accountant's workpapers are not the taxpayer's. They were not prepared by the taxpayer, and they contain no testimonial declarations by him. Furthermore, as far as this record demonstrates, the preparation of all of the papers sought in these cases was wholly voluntary, and they cannot be said to contain compelled

testimonial evidence, either of the taxpayers or of anyone else.[11]   The taxpayer cannot avoid compliance with the subpoena merely by asserting that the item of evidence which he is required to produce contains incriminating writing, whether his own or that of someone else.

The act of producing evidence in response to a subpoena nevertheless has communicative aspects of its own, wholly aside from the contents of the papers produced. Compliance with the subpoena tacitly concedes the existence of the papers demanded and their possession or control by the taxpayer.   It also would indicate the taxpayer's belief that the papers are those described in the subpoena.   *Curcio* v. *United States,* 354 U. S. 118, 125 (1957).   The elements of compulsion are clearly present, but the more difficult issues are whether the tacit averments of the taxpayer are both "testimonial" and "incriminating" for purposes of applying the Fifth Amendment.   These questions perhaps do not lend themselves to categorical answers; their resolution may instead depend on the facts and circumstances of particular cases or classes thereof.   In light of the records now before us, we are confident that however incriminating the

---

[11] The fact that the documents may have been written by the person asserting the privilege is insufficient to trigger the privilege, *Wilson* v. *United States,* 221 U. S. 361, 378 (1911).   And, unless the Government has compelled the subpoenaed person to write the document, cf. *Marchetti* v. *United States,* 390 U. S. 39 (1968); *Grosso* v. *United States,* 390 U. S. 62 (1968), the fact that it was written by him is not controlling with respect to the Fifth Amendment issue.   Conversations may be seized and introduced in evidence under proper safeguards, *Katz* v. *United States,* 389 U. S. 347 (1967); *Osborn* v. *United States,* 385 U. S. 323 (1966); *Berger* v. *New York,* 388 U. S. 41 (1967); *United States* v. *Bennett,* 409 F. 2d, at 897 n. 9, if not compelled.   In the case of a documentary subpoena the only thing compelled is the act of producing the document and the compelled act is the same as the one performed when a chattel or document not authored by the producer is demanded. McCormick § 128, p. 269.

contents of the accountant's workpapers might be, the act of producing them—the only thing which the taxpayer is compelled to do—would not itself involve testimonial self-incrimination.

It is doubtful that implicitly admitting the existence and possession of the papers rises to the level of testimony within the protection of the Fifth Amendment. The papers belong to the accountant, were prepared by him, and are the kind usually prepared by an accountant working on the tax returns of his client. Surely the Government is in no way relying on the "truthtelling" of the taxpayer to prove the existence of or his access to the documents. 8 Wigmore § 2264, p. 380. The existence and location of the papers are a foregone conclusion and the taxpayer adds little or nothing to the sum total of the Government's information by conceding that he in fact has the papers. Under these circumstances by enforcement of the summons "no constitutional rights are touched. The question is not of testimony but of surrender." *In re Harris,* 221 U. S. 274, 279 (1911).

When an accused is required to submit a handwriting exemplar he admits his ability to write and impliedly asserts that the exemplar is his writing. But in common experience, the first would be a near truism and the latter self-evident. In any event, although the exemplar may be incriminating to the accused and although he is compelled to furnish it, his Fifth Amendment privilege is not violated because nothing he has said or done is deemed to be sufficiently testimonial for purposes of the privilege. This Court has also time and again allowed subpoenas against the custodian of corporate documents or those belonging to other collective entities such as unions and partnerships and those of bankrupt businesses over claims that the documents will incriminate the custodian despite the fact that producing the documents tacitly admits their existence and their location in the

hands of their possessor. *E. g., Wilson* v. *United States,* 221 U. S. 361 (1911); *Dreier* v. *United States,* 221 U. S. 394 (1911); *United States* v. *White,* 322 U. S. 694 (1944); *Bellis* v. *United States,* 417 U. S. 85 (1974); *In re Harris, supra.* The existence and possession or control of the subpoenaed documents being no more in issue here than in the above cases, the summons is equally enforceable.

Moreover, assuming that these aspects of producing the accountant's papers have some minimal testimonial significance, surely it is not illegal to seek accounting help in connection with one's tax returns or for the accountant to prepare workpapers and deliver them to the taxpayer. At this juncture, we are quite unprepared to hold that either the fact of existence of the papers or of their possession by the taxpayer poses any realistic threat of incrimination to the taxpayer.

As for the possibility that responding to the subpoena would authenticate [12] the workpapers, production would

---

[12] The "implicit authentication" rationale appears to be the prevailing justification for the Fifth Amendment's application to documentary subpoenas. *Schmerber* v. *California,* 384 U. S., at 763–764 ("the privilege reaches . . . the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers. *Boyd* v. *United States,* 116 U. S. 616"); *Couch* v. *United States,* 409 U. S., at 344, 346 (MARSHALL, J., dissenting) (the person complying with the subpoena "implicitly testifies that the evidence he brings forth is in fact the evidence demanded"); *United States* v. *Beattie,* 522 F. 2d 267, 270 (CA2 1975) (Friendly, J.) ("[a] subpoena demanding that an accused produce his own records is . . . the equivalent of requiring him to take the stand and admit their genuineness"), cert. pending, Nos. 75–407, 75–700; 8 Wigmore § 2264, p. 380 (the testimonial component involved in compliance with an order for production of documents or chattels "is the witness' assurance, compelled as an incident of the process, that the articles produced are the ones demanded"); McCormick § 126, p. 268 ("[t]his rule [applying the Fifth Amendment privilege to documentary subpoenas] is defended on the

express nothing more than the taxpayer's belief that the papers are those described in the subpoena. The taxpayer would be no more competent to authenticate the accountant's workpapers or reports[13] by producing them than he would be to authenticate them if testifying orally. The taxpayer did not prepare the papers and could not vouch for their accuracy. The documents would not be admissible in evidence against the taxpayer without authenticating testimony. Without more, responding to the subpoena in the circumstances before us would not appear to represent a substantial threat of self-incrimination. Moreover, in *Wilson* v. *United States, supra; Dreier* v. *United States, supra; United States* v. *White, supra; Bellis* v. *United States, supra;* and *In re Harris, supra,* the custodian of corporate, union, or partnership books or those of a bankrupt business was ordered to respond to a subpoena for the business' books even though doing so involved a "representation that the documents produced are those demanded by the subpoena," *Curcio* v. *United States,* 354 U. S., at 125.[14]

---

theory that one who produces documents (or other matter) described in the subpoena *duces tecum* represents, by his production, that the documents produced are in fact the documents described in the subpoena"); *People* v. *Defore,* 242 N. Y. 13, 27, 150 N. E. 585, 590 (1926) (Cardozo, J.) ("A defendant is 'protected from producing his documents in response to a *subpoena duces tecum,* for his production of them in court would be his voucher of their genuineness.' There would then be 'testimonial compulsion' ").

[13] In seeking the accountant's "retained copies" of correspondence with the taxpayer in No. 74–611, we assume that the summons sought only "copies" of original letters sent from the accountant to the taxpayer—the truth of the contents of which could be testified to only by the accountant.

[14] In these cases compliance with the subpoena is required even though the books have been kept by the person subpoenaed and his producing them would itself be sufficient authentication to permit their introduction against him.

Whether the Fifth Amendment would shield the tax-payer from producing his own tax records in his possession is a question not involved here; for the papers demanded here are not his "private papers," see *Boyd* v. *United States,* 116 U. S., at 634–635. We do hold that compliance with a summons directing the taxpayer to produce the accountant's documents involved in these cases would involve no incriminating testimony within the protection of the Fifth Amendment.

The judgment of the Court of Appeals for the Fifth Circuit in No. 74–611 is reversed. The judgment of the Court of Appeals for the Third Circuit in No. 74–18 is affirmed.

*So ordered.*

MR. JUSTICE STEVENS took no part in the consideration or disposition of these cases.

MR. JUSTICE BRENNAN, concurring in the judgment.

I concur in the judgment. Given the prior access by accountants retained by the taxpayers to the papers involved in these cases and the wholly business rather than personal nature of the papers, I agree that the privilege against compelled self-incrimination did not in either of these cases protect the papers from production in response to the summonses. See *Couch* v. *United States,* 409 U. S. 322, 335–336 (1973); *id.,* at 337 (BRENNAN, J., concurring). I do not join the Court's opinion, however, because of the portent of much of what is said of a serious crippling of the protection secured by the privilege against compelled production of one's private books and papers. Like today's decision in *United States* v. *Miller, post,* p. 435, it is but another step in the denigration of privacy principles settled nearly 100 years ago in *Boyd* v. *United States,* 116 U. S. 616

(1886). According to the Court, "[w]hether the Fifth Amendment would shield the taxpayer from producing his own tax records in his possession is a question not involved here; for the papers demanded here are not his 'private papers.'" *Ante,* at 414. This implication that the privilege might not protect against compelled production of tax records that are his "private papers" is so contrary to settled constitutional jurisprudence that this and other like implications throughout the opinion [1] prompt me to conjecture that once again the Court is laying the groundwork for future decisions that will tell us that the question here formally reserved was actually answered against the availability of the privilege. *Semble, Hudgens* v. *NLRB,* 424 U. S. 507 (1976). It is therefore appropriate to recall that history and this Court have construed the constitutional privilege to safeguard against governmental intrusions of personal privacy to compel either self-incriminating oral statements or the production of self-incriminating evidence recorded in one's private books and papers. Although as phrased in the Fifth Amendment—"nor shall [any person] be compelled in any criminal case to be a witness against himself"—the privilege makes no express reference, as does the Fourth Amendment, to "papers, and effects," private papers have long been held to have the protection of the privilege, designed as it is "to maintain inviolate large areas of personal privacy." *Feldman* v. *United States,* 322 U. S. 487, 490 (1944).

---

[1] For example, the Court's notation that "[s]pecial problems of privacy which might be presented by subpoena of a diary . . . are not involved here," *ante,* at 401 n. 7, is only made in the context of discussion of the Fourth Amendment and thus may readily imply that even a subpoena of a personal diary containing forthright confessions of crime may not be resisted on grounds of the privilege.

416

## I

Expressions are legion in opinions of this Court that the protection of personal privacy is a central purpose of the privilege against compelled self-incrimination. "[I]t is the invasion of [a person's] indefeasible right of personal security, personal liberty and private property" that "constitutes the essence of the offence" that violates the privilege. *Boyd* v. *United States, supra,* at 630. The privilege reflects "our respect for the inviolability of the human personality and of the right of each individual 'to a private enclave where he may lead a private life.' " *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52, 55 (1964). "It respects a private inner sanctum of individual feeling and thought and proscribes state intrusion to extract self-condemnation." *Couch* v. *United States, supra,* at 327. See also *Tehan* v. *United States ex rel. Shott,* 382 U. S. 406, 416 (1966); *Miranda* v. *Arizona,* 384 U. S. 436, 460 (1966). "The Fifth Amendment in its Self-Incrimination Clause enables the citizen to create a zone of privacy which government may not force him to surrender to his detriment." *Griswold* v. *Connecticut,* 381 U. S. 479, 484 (1965). See also *Katz* v. *United States,* 389 U. S. 347, 350 n. 5 (1967).

The Court pays lip service to this bedrock premise of privacy in the statement that "[w]ithin the limits imposed by the language of the Fifth Amendment, which we necessarily observe, the privilege truly serves privacy interests," *ante,* at 399. But this only makes explicit what elsewhere highlights the opinion, namely, the view that protection of personal privacy is merely a byproduct and not, as our precedents and history teach, a factor controlling in part the determination of the scope of the privilege. This cart-before-the-horse approach is fundamentally at odds with the settled principle that the scope of the privilege is not constrained by the limits of the

wording of the Fifth Amendment but has the reach necessary to protect the cherished value of privacy which it safeguards. See *Schmerber* v. *California,* 384 U. S. 757, 761–762, n. 6 (1966). The "Court has always construed provisions of the Constitution having regard to the principles upon which it was established. The direct operation or literal meaning of the words used do not measure the purpose or scope of its provisions. . . ." *United States* v. *Lefkowitz,* 285 U. S. 452, 467 (1932). "It has been repeatedly decided that [the Fifth Amendment] should receive a liberal construction, so as to prevent stealthy encroachment upon or 'gradual depreciation' of the rights secured by [it], by imperceptible practice of courts or by well-intentioned but mistakenly over-zealous executive officers." *Gouled* v. *United States,* 255 U. S. 298, 304 (1921). See *Maness* v. *Meyers,* 419 U. S. 449, 461 (1975). History and principle, not the mechanical application of its wording, have been the life of the Amendment.[2]

That the privilege does not protect against the production of private information where there is no compulsion, or where immunity is granted, or where there is no threat of incrimination in nowise supports the Court's argument demeaning the privilege's protection of privacy. The unavailability of the privilege in those cases only evidences that, as is the case with the First and Fourth Amendments, the protection of privacy afforded by the privilege is not absolute. The critical question then is the definition of the scope of privacy that is sheltered by the privilege.

---

[2] "The privilege against self-incrimination is a specific provision of which it is peculiarly true that 'a page of history is worth a volume of logic.' " *Ullmann* v. *United States,* 350 U. S. 422, 438 (1956) (Frankfurter, J.). "The previous history of the right, both in England and America, proves that it was not bound by rigid definition." L. Levy, Origins of the Fifth Amendment 428 (1968).

History and principle teach that the privacy protected by the Fifth Amendment extends not just to the individual's immediate declarations, oral or written, but also to his testimonial materials in the form of books and papers.[3] "The right was originally a 'right of silence' . . . only in the sense that legal process could not force incriminating statements from the defendant's own lips. Beginning in the early eighteenth century the English courts widened that right to include protection against the necessity of producing books and documents that might tend to incriminate the accused. . . . Lord Mansfield summed up the law by declaring that the defendant, in a criminal case, could not be compelled to produce any incriminating documentary evidence 'though he should hold it in his hands in Court.' " L. Levy, Origins of the Fifth Amendment 390 (1968).[4] Thus, in recognizing

---

[3] Indeed, *Schmerber* v. *California,* 384 U. S. 757, 764 (1966), held:

"Some tests seemingly directed to obtain 'physical evidence,' for example, lie detector tests measuring changes in body function during interrogation, may actually be directed to eliciting responses which are essentially testimonial. To compel a person to submit to testing in which an effort will be made to determine his guilt or innocence on the basis of physiological responses, whether willed or not, is to evoke the spirit and history of the Fifth Amendment. Such situations call to mind the principle that the protection of the privilege 'is as broad as the mischief against which it seeks to guard.' . . ."

[4] "The language of the Constitution cannot be interpreted safely except by reference to the common law and to British institutions as they were when the instrument was framed and adopted." *Ex parte Grossman,* 267 U. S. 87, 108–109 (1925). But, "the common law rule invoked shall be one not rejected by our ancestors as unsuited to their civil or political conditions." *Grosjean* v. *American Press Co.,* 297 U. S. 233, 249 (1936). Without a doubt, the common-law privilege against self-incrimination in England extended to protection against the production of incriminating personal papers prior to the adoption of the United States Constitution. See, *e. g.,*

the privilege's protection of private books and papers, *Boyd* v. *United States,* 116 U. S., at 633, 634–635, was faithful to this historical conception of the privilege. *Boyd* was reaffirmed in this respect in *Ballmann* v. *Fagin,* 200 U. S. 186 (1906), which held that an individual could not be compelled to produce a personal cashbook containing incriminating evidence. *Schmerber* v. *California,* 384 U. S., at 761, most recently expressly held "that the privilege protects an accused . . . from being compelled to testify against himself, or *otherwise provide the State with evidence of a testimonial or communicative nature . . . ."* (Emphasis supplied.) Indeed, *Boyd's* holding has often been reiterated without question. *E. g., Bellis* v. *United States,* 417 U. S. 85, 87 (1974); *United States* v. *Calandra,* 414 U. S. 338, 346 (1974); *Couch* v. *United States,* 409 U. S. 322 (1973); *United States* v. *Wade,* 388 U. S. 218, 221 (1967); *Gilbert* v. *California,* 388 U. S. 263, 266 (1967); *Davis* v. *United States,* 328 U. S. 582, 587–588 (1946); *United States* v. *White,* 322 U. S. 694, 698–699 (1944); *Wheeler* v. *United States,* 226 U. S. 478, 489 (1913); *Wilson* v. *United States,* 221 U. S. 361, 375 (1911); *ICC* v. *Baird,* 194 U. S. 25, 45 (1904). It may therefore be emphatically stated that until today, there was no room to doubt that it is the Fifth Amendment's "historic function [to protect an individual] from compulsory incrimination through his

---

*Roe* v. *Harvey,* 98 Eng. Rep. 302, 305 (K. B. 1769); *King* v. *Heydon,* 96 Eng. Rep. 195 (K. B. 1762); *King* v. *Purnell,* 95 Eng. Rep. 595, 597 (K. B. 1748); *King* v. *Cornelius,* 93 Eng. Rep. 1133, 1134 (K. B. 1744); *Queen* v. *Mead,* 92 Eng. Rep. 119 (K. B. 1703); *King* v. *Worsenham,* 91 Eng. Rep. 1370 (K. B. 1701). The significance of this English development on the construction of our Constitution is not in any way diminished by this country's experience with the privilege prior to the Constitution's adoption. See Levy, *supra,* n. 2, at 368–404.

own testimony or *personal records.*" *United States* v. *White, supra,* at 701 (emphasis supplied).

The common-law and constitutional extension of the privilege to testimonial materials, such as books and papers, was inevitable. An individual's books and papers are generally little more than an extension of his person. They reveal no less than he could reveal upon being questioned directly. Many of the matters within an individual's knowledge may as easily be retained within his head as set down on a scrap of paper. I perceive no principle which does not permit compelling one to disclose the contents of one's mind but does permit compelling the disclosure of the contents of that scrap of paper by compelling its production. Under a contrary view, the constitutional protection would turn on fortuity, and persons would, at their peril, record their thoughts and the events of their lives. The ability to think private thoughts, facilitated as it is by pen and paper, and the ability to preserve intimate memories would be curtailed through fear that those thoughts or the events of those memories would become the subjects of criminal sanctions however invalidly imposed. Indeed, it was the very reality of those fears that helped provide the historical impetus for the privilege. See *Boyd* v. *United States, supra,* at 631–632; E. Griswold, The Fifth Amendment Today 8–9 (1955); 8 J. Wigmore, Evidence § 2250, pp. 277–281 (McNaughton rev. 1961); *id.,* § 2251, pp. 313–314; McKay, Self-Incrimination and the New Privacy, 1967 Supreme Court Review 193, 212.[5]

---

[5] "And any compulsory discovery by extorting the party's oath, or compelling the production of his private books and papers, to convict him of crime, or to forfeit his property, is contrary to the principles of a free government. It is abhorrent to the instincts of an Englishman; it is abhorrent to the instincts of an American. It may suit the purposes of despotic power; but it cannot abide the

The Court's treatment of the privilege falls far short of giving it the scope required by history and our precedents.[6]   It is, of course, true "that the Fifth Amendment

pure atmosphere of political liberty and personal freedom." *Boyd* v. *United States,* 116 U. S., at 631–632.

The proposition, *ante,* at 409, that *Boyd*'s holding ultimately rested on the Fourth Amendment could not be more incorrect.  *Boyd* did observe that the purposes to be served by the Fourth and Fifth Amendments shed light on each other, 116 U. S., at 633, but the holdings that the compelled production of the papers involved there violated the Fourth and Fifth Amendments were independent of each other.  In holding that "a compulsory production of the private books and papers of the owner of goods sought to be forfeited in such a suit is compelling him to be a witness against himself, within the meaning of the Fifth Amendment to the Constitution, and is the equivalent of a search and seizure—and an un-. reasonable search and seizure—within the meaning of the Fourth Amendment," *id.,* at 634–635, the Court plainly did not make the Fourth Amendment violation a predicate, let alone an essential predicate, for its holding that there was also a Fifth Amendment violation.  The Court is incorrect in suggesting that "the rule against compelling production of private papers rested on the proposition that seizures of or subpoenas for 'mere evidence,' including documents, violated the Fourth Amendment and therefore also transgressed the Fifth."  *Ante,* at 409.  The relation of the Fourth Amendment to the Fifth Amendment violation in *United States* v. *Lefkowitz,* 285 U. S. 452 (1932); *Agnello* v. *United States,* 269 U. S. 20 (1925); and *Gouled* v. *United States,* 255 U. S. 298 (1921), was merely that the illegal searches and seizures in those cases were held to establish the element of compulsion essential to a Fifth Amendment violation.  See *ante,* at 399–400, n. 5.  Even if the Fourth Amendment violations were now held not to establish the element of Fifth Amendment compulsion, it, of course, would not follow that the Fifth Amendment's protection against compelled production of incriminating private papers is lost.

Furthermore, that purely evidentiary material may have been seized in those cases was neither relied upon to establish the Fourth Amendment violations nor, in turn, to establish the Fifth Amendment violations.  Indeed, in *Agnello,* contraband, not mere evidence,

protects against 'compelled self-incrimination, not [the disclosure of] private information,'" *ante,* at 401, but it is also true that governmental compulsion to produce private information that might incriminate violates the protection of the privilege. Similarly, although it is necessary that the papers "contain no testimonial declarations by [the taxpayer]" in order for the privilege not to operate as a bar to production, *ante,* at 409, it does not fol-

---

was illegally seized. Subsequent decisions modifying the "mere evidence" rule, therefore, have left untouched the Fifth Amendment's prohibition against the compelled production of incriminating testimonial evidence. Indeed, citing *Warden* v. *Hayden,* 387 U. S. 294 (1967), the Court notes, that the question is open whether the *legal* search and seizure of some forms of testimonial evidence would violate the Fifth Amendment, *ante,* at 407 n. 9. *Warden* v. *Hayden* observed: "The items of clothing involved in this case are not 'testimonial' or 'communicative' in nature, and their introduction therefore did not compel respondent to become a witness against himself in violation of the Fifth Amendment. . . . This case thus does not require that we consider whether there are items of evidential value whose very nature precludes them from being the object of a reasonable search and seizure." 387 U. S., at 302–303. That observation was plainly addressed not to application of the Fourth Amendment but to application of the Fifth.

Contrary to the Court's intimations, *ante,* at 407–408, neither *Katz* v. *United States,* 389 U. S. 347 (1967); *Osborn* v. *United States,* 385 U. S. 323 (1966); nor *Berger* v. *New York,* 388 U. S. 41 (1967), all involving the Fourth Amendment, lends support to an argument that the Fifth Amendment would not protect the seizure of the private papers of a person suspected of crime. Fifth Amendment challenges to the seizure and use of private papers were not involved in those cases.

[6] The grudging scope the Court today gives the privilege against self-incrimination is made evident by its observation that "[i]n the case of a documentary subpoena the only thing compelled is the act of producing the document . . . ." *Ante,* at 410 n. 11. Obviously disclosure or production of testimonial evidence is also compelled, and the heart of the protection of the privilege is in its safeguarding against compelled disclosure or production of that evidence.

low that papers are not "testimonial" and thus producible because they contain no declarations. And while it may be that the unavailability of the privilege depends on a showng that "the preparation of all of the papers sought in these cases was wholly voluntary," *ibid.*, again it does not follow that the protection is necessarily unavailable if the papers were prepared voluntarily, for it is the compelled *production* of testimonial evidence, not just the compelled creation of such evidence, against which the privilege protects.

Though recognizing that a subpoena served on a taxpayer involves substantial compulsion, the Court concludes that since the subpoena does not compel oral testimony or require the taxpayer to restate, repeat, or affirm the truth of the contents of the documents sought, compelled production of the documents by the taxpayer would not violate the privilege, even though the documents might incriminate the taxpayer. *Ante,* at 409. This analysis is patently incomplete: the threshold inquiry is whether the taxpayer is compelled to produce incriminating papers. That inquiry is not answered in favor of production merely because the subpoena requires neither oral testimony from nor affirmation of the papers' contents by the taxpayer. To be sure, the Court correctly observes that "[t]he taxpayer cannot avoid compliance with the subpoena *merely* by asserting that the item of evidence which he is required to produce contains incriminating writing, whether his own or that of someone else." *Ante,* at 410 (emphasis supplied). For it is not enough that the production of a writing, or books and papers, is compelled. Unless those materials are such as to come within the zone of privacy recognized by the Amendment, the privilege against compulsory self-incrimination does not protect against their production.

424

We are not without guideposts for determining what books, papers, and writings come within the zone of privacy recognized by the Amendment. In *Wilson* v. *United States,* 221 U. S. 361 (1911), for example, the Court held that the Fifth Amendment did not protect against subpoenaing corporate records in the possession and control of the president of a corporation, even though the records might have incriminated him. Though the evidence was testimonial, though its production was compelled, and though it would have incriminated the party producing it, the Fifth Amendment was no bar. The Court recognized that the Amendment "[u]ndoubtedly . . . protected [the president] against the compulsory production of his private books and papers," *id.,* at 377, but with respect to corporate records, the Court held:

> "[T]hey are of a character which subjects them to the. scrutiny demanded. . . . This was clearly implied in the *Boyd Case* where the fact that the papers involved were the *private* papers of the claimant was constantly emphasized. Thus, in the case of public records and official documents, made or kept in the administration of public office, the fact of actual possession or of lawful custody would not justify the officer in resisting inspection, even though the record was made by himself and would supply the evidence of his criminal dereliction." *Id.,* at 380 (emphasis in original).

*Couch* v. *United States* expressly held that the Fifth Amendment protected against the compelled production of testimonial evidence only if the individual resisting production had a reasonable expectation of privacy with respect to the evidence. 409 U. S., at 336. *Couch* relied on *Perlman* v. *United States,* 247 U. S.

7 (1918), where the Court permitted the use against the defendant of documentary evidence belonging to him because "there was a voluntary exposition of the articles" rather than "an invasion of the defendant's privacy." *Id.*, at 14. Under *Couch*, therefore, one criterion is whether or not the information sought to be produced has been disclosed to or was within the knowledge of a third party. 409 U. S., at 332–333. That is to say, one relevant consideration is the degree to which the paper holder has sought to keep private the contents of the papers he desires not to produce.

Most recently, *Bellis* v. *United States*, 417 U. S. 85 (1974), followed the approach taken in *Wilson*. *Bellis* held that the partner of a small law firm could not invoke the privilege against self-incrimination to justify his refusal to comply with a subpoena requiring production of the partnership's financial records. *Bellis* stated: "It has long been established . . . that the Fifth Amendment privilege against compulsory self-incrimination protects an individual from compelled production of his personal papers and effects as well as compelled oral testimony. . . . The privilege applies to the business records of the sole proprietor or sole practitioner as well as to personal documents containing more intimate information about the individual's private life." 417 U. S., at 87–88. *Bellis* also recognized that the Court's "decisions holding the privilege inapplicable to the records of a collective entity also reflect . . . the protection of an individual's right to a 'private enclave where he may lead a private life.' . . . Protection of individual privacy was the major theme running through the Court's decision in *Boyd* . . . and it was on this basis that the Court in *Wilson* distinguished the corporate records involved in that case from the private papers at issue in *Boyd*." *Id.*, at 91–92. "[C]or-

porate records do not contain the requisite element of privacy or confidentiality essential for the privilege to attach." *Id.*, at 92. *Bellis* concluded that the same considerations which precluded reliance upon the privilege with respect to corporate records also precluded reliance upon it with respect to partnership records in the circumstances of that case.[7]

A precise cataloguing of private papers within the ambit of the privacy protected by the privilege is probably impossible. Some papers, however, do lend themselves to classification. See generally Comment, The Search and Seizure of Private Papers: Fourth and Fifth Amendment Considerations, 6 Loyola (LA) L. Rev. 274, 300–303 (1973). Production of documentary materials created or authenticated by a State or the Federal Government, such as automobile registrations or property deeds, would seem ordinarily to fall outside the protection of the privilege. They hardly reflect an extension of the person.

Economic and business records may present difficulty in particular cases. The records of business entities generally fall without the scope of the privilege. But, as noted, the Court has recognized that the privilege extends to the business records of the sole proprietor or practitioner. Such records are at least an extension of an aspect of a person's activities, though con-

---

[7] With respect to a partnership invoice, it thus seems fair to say, as the Court does, *ante,* at 408, "that under [*Bellis*] the precise claim sustained in *Boyd* would now be rejected for reasons not there considered." *Bellis*, however, took care to point out: "We do not believe the Court in *Boyd* can be said to have decided the issue presented today," 417 U. S., at 95 n. 2, thereby leaving unaltered *Boyd's* more general or "imprecise" holding protecting against the compelled production of private papers.

cededly not the more intimate aspects of one's life. Where the privilege would have protected one's mental notes of his business affairs in a less complicated day and age, it would seem that that protection should not fall away because the complexities of another time compel one to keep business records. Cf. *Olmstead* v. *United States*, 277 U. S. 438, 474 (1928) (Brandeis, J., dissenting). Nonbusiness economic records in the possession of an individual, such as canceled checks or tax records, would also seem to be protected. They may provide clear insights into a person's total lifestyle. They are, however, like business records and the papers involved in these cases, frequently, though not always, disclosed to other parties; and disclosure, in proper cases, may foreclose reliance upon the privilege. Personal letters constitute an integral aspect of a person's private enclave. And while letters, being necessarily interpersonal, are not wholly private, their peculiarly private nature and the generally narrow extent of their disclosure would seem to render them within the scope of the privilege. Papers in the nature of a personal diary are *a fortiori* protected under the privilege.

The Court's treatment in the instant cases of the question whether the evidence involved here is within the protection of the privilege is, with all respect, most inadequate. The gaping hole is in the omission of any reference to the taxpayer's privacy interests and to whether the subpoenas impermissibly invade those interests. The observations that the "accountant's workpapers are not the taxpayer's" and "were not prepared by the taxpayer," *ante,* at 409, touch on matters relevant to the taxpayer's expectation of privacy, but do not of themselves determine the availability of the privilege. *Wilson* v. *United States,* 221 U. S., at 378, stated: "[T]he mere fact that

the appellant himself wrote, or signed, the [documents], neither conditioned nor enlarged his privilege. Where one's private documents would tend to incriminate him, the privilege exists although they were actually written by another person." [8] Thus, although "[t]he fact that the documents may have been written by the person asserting the privilege is insufficient to trigger the privilege," *ante,* at 410 n. 11, and "the fact that it was written by him is not controlling . . . ," *ibid.,* this is not to say that the privilege is available only as to documents written by him. For the reasons I have stated at the outset, however, I do not believe that the evidence involved in these cases falls within the scope of privacy protected by the Fifth Amendment.

## II

I also question the Court's treatment of the question whether the act of producing evidence is "testimonial." I agree that the act of production implicitly admits the existence of the evidence requested and possession or control of that evidence by the party producing it. It also implicitly authenticates the evidence as that identified in the order to compel. I disagree, however, that implicit admission of the existence and possession or control of the papers in this case is not "testimonial" merely because the Government could readily have otherwise proved existence and possession or control in these cases.

---

[8] Similarly, *United States* v. *Nobles,* 422 U. S. 225 (1975), held that the Fifth Amendment did not bar production of a defense investigator's summaries of interviews with witnesses. The Court carefully noted, however, that there was no indication that the summaries contained any information conveyed by the defendant to the investigator. *Id.,* at 234.

I know of no Fifth Amendment principle which makes the testimonial nature of evidence and, therefore, one's protection against incriminating himself, turn on the strength of the Government's case against him.

Nor do I consider the taxpayers' implicit authentication an insubstantial threat of self-incrimination. Actually, authentication of the papers as those described in the subpoenas establishes the papers as the taxpayers', thereby supplying an incriminatory link in the chain of evidence against them. It is not the less so because the taxpayers' accountants may also provide the link, since the protection against self-incrimination cannot, I repeat, turn on the strength of the Government's case.

This Court's treatment of handwriting exemplars is not supportive of its position. See *Gilbert* v. *California*, 388 U. S. 263 (1967). The Court has only recognized that "[a] mere handwriting exemplar . . . , like the voice or body itself, is an identifying physical characteristic outside its protection." *Id.*, at 266–267. It is because handwriting exemplars are viewed as strictly nontestimonial, not because they are insufficiently testimonial, that the Fifth Amendment does not protect against their compelled production. Also not supportive of the Court's position is the principle that the custodian of documents of a collective entity is not protected from the act of producing those documents. Nothing in the language of those cases, either expressly or impliedly, indicates that the act of production with respect to the records of business entities is insufficiently testimonial for purposes of the Fifth Amendment. At most, those issues, though considered, were disposed of on the ground, not that production was insufficiently testimonial, but that one in control of the records of an artificial organiza-

tion undertakes an obligation with respect to those records foreclosing any exercise of his privilege.[9]

MR. JUSTICE MARSHALL, concurring in the judgment.

Today the Court adopts a wholly new approach for deciding when the Fifth Amendment privilege against self-incrimination can be asserted to bar production of documentary evidence.[1] This approach has, in various

---

[9] Individuals acting as representatives of a collective group "assume the rights, duties and privileges of the artificial entity or association of which they are agents or officers and they are bound by its obligations." *United States* v. *White*, 322 U. S. 694, 699 (1944). "In view of the inescapable fact that an artificial entity can only act to produce its records through its individual officers or agents, recognition of the individual's claim of privilege with respect to the financial records of the organization would substantially undermine the unchallenged rule that the organization itself is not entitled to claim any Fifth Amendment privilege, and largely frustrate legitimate governmental regulation of such organizations." *Bellis* v. *United States*, 417 U. S., at 90. Indeed, in one of the more recent corporate records cases, *Curcio* v. *United States*, 354 U. S. 118, 125 (1957), the Court expressly recognized that "[t]he custodian's act of producing books or records in response to a subpoena *duces tecum* is itself a representation that the documents produced are those demanded by the subpoena." The Court in *Curcio*, however, apparently did not note any self-incrimination problem because of the undertaking by the custodian with respect to the documents. (One charged with failure to comply with an order to produce, however, may not thereafter be compelled to testify as to the existence or his control of the documents. See *Curcio* v. *United States, supra.*) In the present cases, of course, the taxpayers are not representatives of any artificial entity and have not undertaken any obligation with respect to that entity or its documents. They have stipulated, however, that the documents involved here exist and are those described in the subpoenas, thereby obviating any problem as to self-incrimination in these cases resulting from the act of production itself.

[1] The Court's theory would appear to apply to real evidence as well.

forms, been discussed by commentators for some time; nonetheless, as I noted a few years ago, the theory "has an odd sound to it." *Couch* v. *United States*, 409 U. S. 322, 348 (1973) (dissenting). The Fifth Amendment basis for resisting production of a document pursuant to subpoena, the Court tells us today, lies not in the document's contents, as we previously have suggested, but in the tacit verification inherent in the act of production itself that the document exists, is in the possession of the producer, and is the one sought by the subpoena.

This technical and somewhat esoteric focus on the testimonial elements of production rather than on the content of the evidence the investigator seeks is, as MR. JUSTICE BRENNAN demonstrates, contrary to the history and traditions of the privilege against self-incrimination both in this country and in England, where the privilege originated. A long line of precedents in this Court, whose rationales if not holdings are overturned by the Court today, support the notion that "any forcible and compulsory extortion of a man's . . . private papers to be used as evidence to convict him of crime" compels him to be a witness against himself within the meaning of the Fifth Amendment to the Constitution. *Boyd* v. *United States,* 116 U. S. 616, 630 (1886). See also *Bellis* v. *United States,* 417 U. S. 85, 87 (1974); *Couch* v. *United States, supra,* at 330; *Schmerber* v. *California,* 384 U. S. 757, 763–764 (1966); *Davis* v. *United States,* 328 U. S. 582, 587–588 (1946); *United States* v. *White,* 322 U. S. 694, 698–699 (1944); *Wheeler* v. *United States,* 226 U. S. 478, 489 (1913); *Wilson* v. *United States,* 221 U. S. 361, 377 (1911).

However analytically imprecise these cases may be, they represent a deeply held belief on the part of the Members of this Court throughout its history that there

are certain documents no person ought to be compelled to produce at the Government's request. While I welcome the Court's attempt to provide a rationale for this long-standing rule, it is incumbent upon the Court, I believe, to fashion its theory so as to protect those documents that have always stood at the core of the Court's concern. Thus, I would have preferred it had the Court found some room in its theory for recognition of the import of the contents of the documents themselves. See *Couch* v. *United States, supra,* at 350 (MARSHALL, J., dissenting).

Nonetheless, I am hopeful that the Court's new theory, properly understood and applied, will provide substantially the same protection as our prior focus on the contents of the documents. The Court recognizes, as others have argued, that the act of production can verify the authenticity of the documents produced. See, *e. g., United States* v. *Beattie,* 522 F. 2d 267 (CA2 1975), cert. pending, Nos. 75–407, 75–700. But the promise of the Court's theory lies in its innovative discernment that production may also verify the documents' very existence and present possession by the producer. This expanded recognition of the kinds of testimony inherent in production not only rationalizes the cases, but seems to me to afford almost complete protection against compulsory production of our most private papers.

Thus, the Court's rationale provides a persuasive basis for distinguishing between the corporate-document cases and those involving the papers of private citizens. Since the existence of corporate record books is seldom in doubt, the verification of their existence, inherent in their production, may fairly be termed not testimonial at all. On the other hand, there is little reason to assume the present existence and possession of most private papers, and certainly not those MR. JUSTICE BRENNAN places at the top of his list of documents that the privilege should protect. See *ante,* at 426–427 (concurring in judgment).

Indeed, there would appear to be a precise inverse relationship between the private nature of the document and the permissibility of assuming its existence. Therefore, under the Court's theory, the admission through production that one's diary, letters, prior tax returns, personally maintained financial records, or canceled checks exist would ordinarily provide substantial testimony. The incriminating nature of such an admission is clear, for while it may not be criminal to keep a diary, or write letters or checks, the admission that one does and that those documents are still available may quickly—or simultaneously—lead to incriminating evidence. If there is a "real danger" of such a result, that is enough under our cases to make such testimony subject to the claim of privilege. See *Rogers* v. *United States*, 340 U. S. 367 (1951); *Brown* v. *Walker*, 161 U. S. 591 (1896); *Counselman* v. *Hitchcock*, 142 U. S. 547 (1892). Thus, in practice, the Court's approach should still focus upon the private nature of the papers subpoenaed and protect those about which *Boyd* and its progeny were most concerned.

The Court's theory will also limit the prosecution's ability to use documents secured through a grant of immunity. If authentication that the document produced is the document demanded were the only testimony inherent in production, immunity would be a useful tool for obtaining written evidence. So long as a document obtained under an immunity grant could be authenticated through other sources, as would often be possible, reliance on the immunized testimony—the authentication—and its fruits would not be necessary, and the document could be introduced. The Court's recognition that the act of production also involves testimony about the existence and possession of the subpoenaed documents mandates a different result. Under the Court's theory, if the document is to be obtained the

immunity grant must extend to the testimony that the document is presently in existence. Such a grant will effectively shield the contents of the document, for the contents are a direct fruit of the immunized testimony—that the document exists—and cannot usually be obtained without reliance on that testimony.[2]  Accordingly, the Court's theory offers substantially the same protection against procurement of documents under grant of immunity that our prior cases afford.

In short, while the Court sacrifices our pragmatic, if somewhat *ad hoc,* content analysis for what might seem an unduly technical focus on the act of production itself, I am far less pessimistic than MR. JUSTICE BRENNAN that this new approach signals the end of Fifth Amendment protection for documents we have long held to be privileged.  I am not ready to embrace the approach myself, but I am confident in the ability of the trial judges who must apply this difficult test in the first instance to act with sensitivity to our traditional concerns in this uncertain area.

For the reasons stated by MR. JUSTICE BRENNAN, I concur in the judgment of the Court.

---

[2] Similarly, the Court's theory affords protection to one who possesses documents that he cannot authenticate.  If authentication were the only relevant testimony inherent in the act of production, such a person would be forced to relinquish his documents, for he provides no authentication testimony of relevance by producing them in response to a subpoena.  See *United States* v. *Beattie,* 522 F. 2d 267 (CA2 1975), cert. pending, Nos. 75–407, 75–700. Under the Court's theory, however, if the existence of these documents were in question, the custodian would still be able to assert a claim of privilege against their production.