**UNITED STATES of America and Gerald T. Padar, Special Agent, Internal Revenue Service, Petitioners-Appellees,**

v.

**Helen V. PORTER and Nickolaus Beligratis, Respondents-Appellants.**

**No. 83–1278.**

United States Court of Appeals, Seventh Circuit.

Argued April 1, 1983.

Decided July 6, 1983.

Robert G. Nath, Asst. Atty. Gen., Tax Division, Dept. of Justice, Washington, D.C., for petitioners-appellees.

Lewis M. Porter, Jr., Boodell, Sears, Sugure, Giambalvo & Crowley, Chicago, Ill., for respondents-appellants.

Before WOOD, ESCHBACH and COFFEY, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Respondents-Appellants taxpayer, a sole proprietor, and his attorney appeal from the district court's order, 557 F.Supp. 703, commanding their compliance with three Internal Revenue Service summonses requiring production of the taxpayer's business records, including cancelled checks, bank deposit slips, various ledgers and journals and payroll and sales tax records, arguing that such forced disclosures would violate the taxpayer's right against self-incrimination as set forth in *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). We hold that this claim is moot with respect to items which have been already surrendered to the IRS pursuant to the district court's order, but that with respect to the remaining items—the cancelled checks and deposit slips—*Fisher* provides certain limited Fifth Amendment protection. However, we also remand to the district court to permit the government to offer the respondent taxpayer statutory use immunity with respect to the protected aspects of the documents' production and to permit the court to fashion a protective order sufficient to allow use of the contents of the documents while guarding against a violation of taxpayer's Fifth Amendment rights.

## I.

The facts are not in dispute. During 1976–78, the taxpayer, Beligratis, operated two hairdressing salons in the Chicago area as a sole proprietor. During this time, Beligratis employed an accounting firm to prepare his income statements, balance sheets, profit and loss statements, federal payroll tax returns, personal income tax returns, W–2 forms and federal unemployment tax returns; these reports were generated through Beligratis' submission of carbon copies of checks written by him, records of his cash disbursements, bank account statements with cancelled checks, and a sheet recording the monthly sales of each salon. The Chicago District of the IRS began an examination of Beligratis' federal income tax returns for 1976–78, and a revenue agent reviewed the records of the two sole proprietorships with the result that the case was referred to the IRS Criminal Investigative Division.

Special Agent Gerald Padar of that Division was assigned to the case and in early April, 1980 requested the taxpayer's records concerning his personal finances and business transactions during the investigated period. However, shortly thereafter, Beligratis transferred the requested records, which were in his accounting firm's possession, to his lawyer, respondent Porter. In August, 1980, Special Agent Padar issued an IRS summons to Porter requiring that she produce records relating to the taxpayer's personal checking and savings accounts and his business checking accounts, including bank statements, cancelled checks, deposit slips, statements of interest earned, statements of interest paid on personal and business loans, cash receipts journals, cash disbursement journals, appointment books or records of services provided, tax withholding forms, and other tax-related records. Respondent Porter appeared before Padar and refused to comply with the summons, claiming that the government already possessed some of these items and that the others were protected by the attorney-client privilege because these items would have enjoyed Fifth Amendment protection in Beligratis' hands. In September,

1980, Padar issued a second summons to Porter, again ordering production of specified business records; Porter again invoked the attorney-client privilege with respect to the records demanded. In December, 1980, Padar issued a third summons, this time against Beligratis, ordering a production of the same documents specified in the previous summonses. In January, 1981, the taxpayer and Porter met with Padar and refused to comply with the third summons, this time directly asserting Beligratis' Fifth Amendment privilege with respect to these materials.

In February, 1983, the district court ordered respondents to surrender the summoned materials (except for the appointment books)[1] to Padar. In its previous findings, the district court assumed, and it is not disputed here, that the requested materials were turned over to Porter to facilitate legal advice rather than simply to evade the summons, and thus measured the scope of the attorney-client privilege by the Fifth Amendment privilege attaching to the documents had they been in Beligratis' possession, the procedure mandated in *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). The district court then undertook the Fifth Amendment analysis mandated under *Fisher*—that is, whether *the act of producing* the summoned records would *itself* involve testimonial self-incrimination. *Fisher,* 425 U.S. at 410–11, 96 S.Ct. at 1580–81. The court found, as did the Supreme Court in *Fisher,* 425 U.S. at 409–13, 96 S.Ct. at 1580–82, that the self-incriminatory and testimonial aspects of the act of complying with the summonses were insufficient to justify Fifth Amendment protection with respect to documents not prepared by Beligratis himself (e.g., the ledgers and payroll records which were prepared by the accounting firm).

The district court expressed greater difficulty, however, in determining whether the cancelled checks, deposit slips and appointment books retained residual Fifth Amendment protection in light of the Supreme

Court's explicit reservation in *Fisher,* 425 U.S. at 414, 96 S.Ct. at 1582, of the question of protection attaching to the taxpayer's "own tax records in his possession" and his "private papers." The district court felt it necessary to take the next step and determine whether the doctrine of *Boyd v. United States,* 116 U.S. 616, 634, 635, 6 S.Ct. 524, 534, 534, 29 L.Ed. 746 (1911), protecting wholesale the production of "private papers," remained viable in light of *Fisher* and post-*Fisher* cases such as *Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). Determining that the *Boyd* doctrine was indeed alive, the district court nonetheless found only the taxpayer's summoned "appointment books" to be sufficiently "private" to come under it; the checks and deposit slips the court found to be by their nature prepared for disclosure and thus without the requisite halo of privacy, citing *United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), a Fourth Amendment case. Apparently assuming these items were also not protected under *Fisher,* the district court ordered the checks and deposit slips surrendered along with the other items.

Respondents then moved for a stay pending appeal; the stay was granted only with respect to the checks, deposit slips and appointment books. Following this ruling, all of the summoned items except for the checks, deposit slips and appointment books were surrendered by respondents to the IRS.

II.

■ We must first address the scope of the present appeal. Respondents claim that, even though they have surrendered each of the summoned items except the checks and deposit slips (and the appointment books whose protection is uncontested by the government), their Fifth Amendment claims with respect to the surrendered items are not moot. This court and other circuits, however, have flatly held that a

---

1. The government does not cross-appeal from the district court's denial of summons enforce-

ment with respect to the appointment books.

taxpayer's submission of material in compliance with an IRS summons renders any constitutional objections to that compelled submission moot. *United States v. Kis,* 658 F.2d 526, 532–34 (7th Cir.1981), *cert. denied sub nom. Salkin v. United States,* 455 U.S. 1018, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982). *Accord, United States v. Trail's End Motel, Inc.,* 657 F.2d 1169 (10th Cir.1981); *United States v. Equity Farmers Elevator,* 652 F.2d 752 (8th Cir.1981); *United States v. First American Bank,* 649 F.2d 288 (5th Cir.1981).

Respondents, however, argue that we should now fashion a special exception to the mootness doctrine by incorporating into it the doctrine of *Perlman v. United States,* 247 U.S. 7, 12–13, 38 S.Ct. 417, 419, 62 L.Ed. 950 (1918), which permits special interlocutory review of an order directed against a third party compelling disclosure in connection with a grand jury proceeding on the theory that the party ultimately damaged by the disclosure cannot expect the third party target of the order to risk contempt in order to obtain immediate review of the order. Analogously, respondents argue, since the taxpayer here could not have expected his attorney, respondent Porter, to risk contempt by refusing to disclose the materials which she has now surrendered, he was denied effective review under a theory similar to that of the "capable of repetition, yet evading review" exception to mootness enunciated first in *Southern Pacific Terminal Co. v. I.C.C.,* 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911).

But application of the *Perlman* exception here is without any basis, for that is a doctrine of "ripeness," not mootness. It is designed to interpose review to prevent the kind of irrevocable disclosure which has already occurred here. Accordingly, this court has held that the *Perlman* doctrine itself may not apply where, as here, a substantial disclosure to the government of the information sought to be protected has already occurred. *United States v. Calandra,* 706 F.2d 225, 227–228 (7th Cir.1983). Although we made a passing reference to the *Perlman* doctrine in the context of a post-disclosure mootness determination in *United States v. Kis,* 658 F.2d at 534, it is clear that the *Perlman* policy of permitting spe-

cial interlocutory review, even if it were somehow relevant to a mootness inquiry, cannot revive a disclosure controversy which has already been laid to rest, as here, by the surrender of the documents sought.

### III.

■ We now turn to the substance of this appeal: whether the taxpayer's cancelled checks and bank deposit slips are entitled to Fifth Amendment protection under *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976).

In *Fisher,* the Supreme Court held that sole proprietor taxpayers were not entitled, through their attorneys, to assert a Fifth Amendment privilege to resist an IRS subpoena of their accountants' workpapers (including analyses by the accountants of the taxpayers' cancelled checks and deposit slips). The Supreme Court eschewed a content-based approach to Fifth Amendment protection of subpoenaed documents, noting that since the documents were not themselves *composed* under the threat of compulsion, the "taxpayer cannot avoid compliance with the subpoena merely by asserting that the item of evidence which he is required to produce contains incriminatory writing, whether his own or that of someone else." 425 U.S. at 410 & n. 11, 96 S.Ct. at 1580 & n. 11. Instead, the Court held, the only possible Fifth Amendment interest arises in documentary disclosure where "[t]he *act of producing* evidence in response to a subpoena nevertheless has communicative aspects of its own, wholly aside from the contents of the papers produced." *Id.* (emphasis added). The question whether the *act* of disclosure was "testimonial" was, in the Court's view, not susceptible to "categorical answers." However, the Court undertook an analysis of the possible "testimonial" implications of the disclosure of the accountant-prepared documents and distinguished at least three such possible implicit averments inherent in the provision of the requested documents: that the papers demanded exist, that they are in the possession or control of the taxpayer, and that they are authentic, 425 U.S. at 410–13, 96

S.Ct. at 1580–82. As to the first two implied communications, the Court noted that the existence and location of the subpoenaed documents were a "foregone conclusion" in the case before it, and thus the "taxpayer adds little or nothing to the sum total of the Government's information by conceding that he in fact has the papers." *Id.* at 411, 412, 96 S.Ct. at 1581, 1581. The Court also held that, under the circumstances of the case before it, there was no possibility that responding to the subpoena could amount to the third variety of tacit communication: an authentication of the documents. This was so because the "taxpayer would be no more competent to authenticate the accountants' workpapers or reports by producing them than he would be to authenticate them if testifying orally. The taxpayer did not prepare the papers and could not vouch for their accuracy." *Id.* at 413, 96 S.Ct. at 1582.

The district court here applied *Fisher's* three-pronged test in inquiring into possible testimonial communications inherent in compliance with all of the summonses. It held that *Fisher* did not protect the bulk of the records which were prepared by Beligratis' accountant. The court reasoned that the existence and location of the documents were not in issue, and were indeed admitted by respondents, and that the possibility of their implicit *authentication* was not significant in view of the fact that their authenticity was more authoritatively established by the accountant who authored them.

However, the district court took a different approach with respect to the cancelled checks and deposit slips. The court stated that it viewed the prior and controlling questions with respect to these items to be 1) whether the *Fisher* doctrine was applicable at all to a taxpayer's "private papers," or, stated differently, whether *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1911) survives *Fisher,* and, if so, 2) whether Beligratis' cancelled checks and deposit slips were "private papers" entitled to *Boyd* protection. The district court determined that *Boyd* did in fact survive *Fisher,* but that the items at issue here were not entitled to *Boyd* protection, as they were

documents prepared for commercial transmittal and not personal records concerning which the originator could presume an expectation of privacy. From this analysis, the district court apparently concluded that, lacking *Boyd* coverage, the cancelled checks and deposit slips should be subjected to the more limited protection afforded by *Fisher.* And, although not explicitly performing that three-step inquiry into the possible communication of existence, location and authenticity of the documents inherent in summons compliance, the court apparently concluded that the act of producing the deposit slips and cancelled checks was not sufficiently testimonial to impart to them any *Fisher* protection.

Although we do not find the considered analysis of the district court to be unfounded, we feel compelled to express another view. Without having to reach the question of the continuing viability of the *Boyd* "private papers" doctrine, we believe that the application of *Fisher's* "implicit testimony" analysis to the case at bar yields the conclusion that the cancelled checks and deposit slips are entitled to limited Fifth Amendment protection.

We base this conclusion not on any implied verification of the existence and location of these documents which ensues from their production. As in *Fisher,* the existence and location of the disputed documents is not in issue, and the respondents concede this in their brief. But here, unlike in *Fisher,* the "implicit authentication" ensuing from the production of the documents is undeniable. The Supreme Court held in *Fisher* that the danger of implied authentication of an accountant's analysis through the taxpayer's production of them was nonexistent since "the taxpayer did not prepare the papers and could not vouch for their accuracy" and thus such "production would express nothing more than the taxpayer's belief that the papers are those described in the subpoena," 425 U.S. at 413, 96 S.Ct. at 1582. By contrast, here the taxpayer, Beligratis, both "prepared" the checks and deposit slips and could vouch for their accuracy; indeed, it is likely that he was the party whose authentication would be most authoritative. The production and perforce

"implicit authentication" of these documents seems to us precisely the kind of compelled "testimony" from which the Supreme Court sought to protect individuals through its *Fisher* analysis.

Other courts have agreed with us that *Fisher*'s "implied authentication" test affords protection to business records generated by a sole proprietor taxpayer. *See, e.g., United States v. Doe,* 628 F.2d 694, 695 (1st Cir.1980) (accountant's personal business records); *In Re Grand Jury Proceedings United States (Martinez),* 626 F.2d 1051, 1055–56 (1st Cir.1980) (physician's appointment logs); *United States v. Greenleaf,* 546 F.2d 123, 125 n. 1, 126 n. 7 (5th Cir.1977) (*inter alia,* cancelled checks, cash receipt books); *United States v. Plesons,* 560 F.2d 890, 892 n. 3, 893 (8th Cir.1977) (physician's appointment records); *United States v. Beattie,* 541 F.2d 329 (2d Cir.), *cert. denied,* 425 U.S. 970, 96 S.Ct. 2165, 48 L.Ed.2d 793 (1976) (taxpayer's letters to accountant); *United States v. Fox,* 554 F.Supp. 422, 425 (S.D.N.Y.1983) (all documents bearing taxpayer's own writing); *In Re Grand Jury Empanelled March 19, 1980,* 541 F.Supp. 1, 2–3 (D.N.J.1981) (*inter alia,* bank statements, cancelled checks, bank deposit tickets). *See also* Wigmore, 8 *Evidence,* § 2264 at 380 (McNaughton Rev. 1961). Like our own, these courts have not relied on any wholesale protection for "private papers" stemming from *Boyd,*[2] but have rather found that taxpayer-generated materials such as checks, bank deposit slips and appointment logs contain the potential

for implicit authentication through production that *Fisher* prohibits.

## IV.

Having determined that the *act of production* of Beligratis' cancelled checks and deposit slips results in compelled "testimony" protected under the Fifth Amendment, it does not follow that the *contents* of these documents enjoy any such protection; indeed, *Fisher* instructs us to the contrary. We are thus confronted with the problem of fashioning a remedy which would allow the government to use the contents of the documents without permitting a breach of Beligratis' right to be protected from his implicit authentication of them in violation of his Fifth Amendment rights.

The First Circuit has taken the lead in suggesting how such a remedy might be fashioned. It has indicated that the proper course is to permit the government access to the protected records but only upon the condition that the government grant statutory use immunity with respect to the "testimonial" aspects of the documents' production. *In Re Grand Jury Proceedings United States (Martinez),* 626 F.2d 1051, 1058 (1st Cir.1980). *See also United States v. Doe,* 628 F.2d 694 (1st Cir.1980); Note, *The Rights of Criminal Defendants and the Subpoena Duces Tecum: The Aftermath of Fisher v. United States,* 95 Harv.L.Rev. 683, 688–90 (1982) (approving First Circuit approach). Under this approach, the government would immunize Beligratis pursuant to 18 U.S.C. §§ 6002, 6003[3] with respect to

---

**2.** Indeed, despite lengthy discussion in the government's brief concerning the continuing viability of *Boyd*'s wholesale "private papers" exception in light of *Fisher,* we do not understand the respondents even to be arguing that *Boyd* affords a means of absolutely avoiding *Fisher,* but only that *Boyd*-type taxpayer documents meet the *Fisher* "implicit authentication" test. *See* Respondents' Brief at 29 and Respondents' Reply Brief at 7–8.

**3.** 18 U.S.C. § 6003 provides:

(a) In the case of any individual who has been or may be called to testify or provide other information at any proceeding before or ancillary to a court of the United States or a grand jury of the United States, the United States district court for the judicial district in which the proceeding is or may be held shall

issue, in accordance with subsection (b) of this section, upon the request of the United States attorney for such district, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of the privilege against self-incrimination, such order to become effective as provided in section 6002 of this part.

(b) A United States attorney may, with the approval of the Attorney General, the Deputy Attorney General, or any designated Assistant Attorney General, request an order under subsection (a) of this section when in his judgment—

(1) the testimony or other information from such individual may be necessary to the public interest; and

"use" (before the grand jury, at trial, or in further investigation) of any authentication evidence stemming from the act of production.[4] But having so immunized him, the government would then be permitted to introduce into evidence the unprotected *contents* of the documents as long as they were authenticated by another means.[5]

> (2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination.
>
> 18 U.S.C. § 6002 provides:
>
> Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to
>
> (1) a court or grand jury of the United States,
>
> (2) an agency of the United States ...
>
> \* \* \* \* \* \*
>
> and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

4. The possibility of such a hybrid solution to the *Fisher* problem was first acknowledged by Justice Marshall in his *Fisher* concurrence:

> If authentication that the document produced is the document demanded were the only testimony inherent in production, immunity would be a useful tool for obtaining written evidence. So long as the document obtained under an immunity grant could be authenticated through other sources, as would often be possible, reliance on the immunized testimony—the authentication—and its fruits would not be necessary, and the document could be introduced.

425 U.S. at 433, 96 S.Ct. at 1591. To our knowledge, this solution has not been embraced or rejected by any circuit other than the First, although the Third Circuit has expressed some doubts as to its practical workability. *See In the Matter of Grand Jury Empanelled March 19, 1980,* 680 F.2d 327, 337 & n. 19, n. 20 (3d Cir.1982). We have attempted to address these problems through an additional requirement of a protective order. *See infra.*

Respondents argue that this kind of bifurcated immunity with respect to the *production* but not the *contents* of the documents is not permissible under 18 U.S.C. § 6002. They argue that because the language of that provision requires that "no [immunized] testimony *or other information* compelled under the order ... may be used against the witness ...", 18 U.S.C. § 6002(3) (emphasis added), and "other information" is defined broadly at 18 U.S.C. § 6001(2) as "any book, paper, document, record, recording, or other material," it must be

the case that that "other information" whose use is forbidden would also include the *contents* of the documents. Such a reading, however, ignores the plain intent of the statute that the grant on immunity thereunder "is intended to be as broad as, but not broader than, the privilege against self-incrimination." H.R. 1549, 91st Cong., 2d Sess., 1970 U.S.Code Cong. & Adm.News at 4017. Since *Fisher* held that the *contents* of these documents do not come under that privilege, the statute plainly does not extend to them. In addition, we note that Congress indicated that the statute's "scope is intended to be comprehensive, including all information given as *testimony* but not orally." H.R. 1549, *supra;* 1970 U.S.Code Cong. & Ad.News at 4017 (emphasis added). Since the *contents* of the documents here are not "testimony" under *Fisher,* they are not within the immunity created by the statute. This reading that only "testimonial" information is immunized by the statute does not, as respondents contend, nonsensically restrict the definition of "proceedings before an agency" in 18 U.S.C. § 6001 which includes "any proceeding ... with respect to which [the agency] is authorized too [sic] issue subpoenas and to take testimony or receive *other information* from witnesses under oath." (emphasis added). This non-exclusive definition would still allow application of the statute to proceedings where the agency may also review non-testimonial documentary information.

5. For example, it may well be that Beligratis' cancelled checks would be self-authenticating under the "commercial paper" exception of Fed.R.Evid. 902(9).

We reserve the question, not presented here, whether in cases where the existence and location of the summoned documents is at issue and hence their production would be arguably "testimonial" with respect to these facts, the introduction of the *contents* of the documents would automatically be a breach of the statutory provision against "derivative use" of the information which would have to be immunized under the approach outlined here. As Justice Marshall suggested in his *Fisher* concurrence, in such cases of controverted existence and location, a "different result" might be warranted:

> Under the Court's theory, if the document is to be obtained the immunity grant must extend to the testimony that the document is presently in existence. Such a grant will effectively shield the contents of the document, for the contents are a direct fruit of the immunized testimony—that the document

We think that this somewhat unorthodox approach has much to recommend it, but we are concerned that the grant of use immunity alone may not be adequate to fully protect Beligratis' Fifth Amendment privilege, for there is nothing in the statutory "use immunity" concept which would prohibit the government's *reference* to (as opposed to evidentiary "use" of) Beligratis' having produced the documents; indeed, permitting such reference is the very advantage that the government obtains in the normal case of witness use immunity. Under the First Circuit approach, as we understand it, then, there is no guarantee that the grand or petit jury may not ultimately be swayed by the implicit authentication stemming from Beligratis' documentary production rather than by alternative means of authentication, *see United States v. Hinton,* 543 F.2d 1002, 1007, 1009 (2d Cir.), *cert. denied sub nom. Carter v. United States,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976); *Goldberg v. United States,* 472 F.2d 513, 516 (2d Cir.1973), although it may be that the First Circuit intended that protection be afforded to avoid that possibility.

We therefore would specifically require that, before the checks and deposit slips may be obtained for further investigation, not only must Beligratis be granted statutory use immunity with respect to these documents, but also the court must fashion a protective order forbidding the government from referring in any way before the grand jury or at trial to the fact that Beligratis produced the documents. Such a protective order will, if properly designed and enforced, effectively shield Beligratis from any infringement of his Fifth Amendment rights, for only the compelled documentary contents, rather than his implied "testimony" *via* production, will be available. We need not at this point spell out the details of such a protective order, especially as we are unfamiliar with the substance of the investigation and probable evidentiary con-

figuration of the instant case. That task is better left to the district court upon remand.

## V.

We consider briefly the government's alternative argument that any Fifth Amendment protection attaching to the checks and deposit slips under *Fisher* and its progeny is eclipsed because these documents fall under the "required records" exception to the privilege, an exception enunciated in *Shapiro v. United States,* 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948), and its progeny, *Marchetti v. United States,* 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), and *Grosso v. United States,* 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968). We have previously rejected in dictum the application of the "required records" exception to a taxpayer's Fifth Amendment privilege with respect to his financial records, *see Hill v. Philpott,* 445 F.2d 144, 146 n. 2 (7th Cir.), *cert. denied,* 404 U.S. 991, 92 S.Ct. 533, 30 L.Ed.2d 542 (1971), but at least one other court has suggested that it might have some application, *see United States v. Fox,* 554 F.Supp. 422, 425–26 (S.D.N.Y.1983), and one prominent commentator has described it as a "potential threat," *see Bittker, Federal Income Tax Records—Confidentiality v. Public Disclosure,* 20 Washburn L.Rev. 479, 485–86 (1981). We do not think the exception applies here.

■ Under the "required records" doctrine, documents may be required to be produced when the government requires the preservation of those documents pursuant to an essentially regulatory scheme, and the records have also assumed "public aspects" which render them analogous to public documents. *Shapiro,* 335 U.S. at 33, 34, 68 S.Ct. at 1392, 1393; *Marchetti,* 390 U.S. at 55–56, 88 S.Ct. at 706; *Grosso,* 390 U.S. at 67–68, 88 S.Ct. at 713. In *Shapiro,* for example, the Supreme Court held that the keeping of transaction records which were

---

exists—and cannot usually be authenticated without reliance on that testimony. 425 U.S. at 433–34, 96 S.Ct. at 1591–92. Since here production potentially communicates only authenticity, we need not determine whether

documentary contents would be protected under the 18 U.S.C. § 6002 "derivative use" prohibition where existence and location are in controversy as well.

expressly contemplated by Congress as a necessary device and a condition for commercial operation under the Emergency Price Control Act was related to a positive regulatory scheme and imbued the records with a "public" character sufficient to overcome the Fifth Amendment privilege. 335 U.S. at 8–15, 32–33, 68 S.Ct. at 1379–1383, 1391–1392.

■ The matter stands very differently here. While the Internal Revenue Code, 26 U.S.C. § 6001 requires the taxpayer to "keep such records ... as the [IRS] may from time to time prescribe" and the IRS has, pursuant to this authority, mandated that taxpayers "keep such permanent books of account or records, including inventories, as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown ... in any return ...", Treas.Reg. § 1.6001–1(a), T.D. 7577, 1979–1 C.B. 409, the taxpayer is not, as in *Shapiro,* required to keep such records as an ongoing condition of operating his business under a comprehensive government regulatory scheme. The taxpayer-IRS relationship is, instead, a more limited one which creates an imperative for access to records only in rare cases. In short, the taxpayer's substantive activities are not positively "regulated" by the IRS sufficient to create a *Shapiro*-type interest in unconditional access to those records.[6]

More importantly, the very nature of the limited taxpayer-government relationship is, we think, insufficient to imbue the taxpayer's cancelled checks and deposit slips with "public aspects" as required under *Shapiro.* Unlike the transaction records which the Emergency Price Control Act provided would be routinely available to the government as a condition of the business' operation, a sole proprietor's checks and

bank transactions are inspected by revenue authorities only in the unusual situation of an audit. This rarely attempted access hardly transforms the gamut of an individual businessman's financial records into an extension of the public archives. As the Supreme Court noted in *Marchetti* in finding that the record-keeping provisions of a federal occupational tax scheme did not imbue those records with "public aspects" in the *Shapiro* sense, "The Government's anxiety to obtain information known to a private individual does not without more render that information public; if it did, no room would remain for the application of [the Fifth Amendment]. Nor does it stamp information with a public character that the Government has formalized its demands in the attire of a statute; if this alone were sufficient, the constitutional principle would be entirely abrogated by any Act of Congress" 390 U.S. at 57, 88 S.Ct. at 707. Similarly, we decline to carve such a radical exception to the right against self-incrimination in circumstances so little analogous to those in which the Supreme Court has applied it.

## CONCLUSION

For the foregoing reasons, the district court's order is reversed insofar as it unconditionally commands the respondents to produce Beligratis' cancelled checks and bank deposit slips, and the case is remanded to permit the government if it chooses to grant statutory immunity with respect to the "testimonial" aspects of their production, and to allow the district court to fashion an appropriate protective order which will permit possible future use of these documents before the grand jury and at trial without reference to the circumstances of their production.[7] Circuit Rule 18 shall

**6.** Nothing in *California Banker's Association v. Schultz,* 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974), is to the contrary. There, the Supreme Court made a passing reference to Treasury Regulations requiring record maintenance as being similar to the requirements involved in *Shapiro.* But this reference occurred in the course of an inquiry into the due process match between the record-keeping requirement and the statutory end. *See* 416 U.S. at 45–46, 94 S.Ct. at 1509–1510. The Supreme Court was

not in any way considering the "required records" exception to the Fifth Amendment privilege.

**7.** In the narrow circumstances of this case, where neither existence nor possession, but only authentication, of the documents is contestable, we see no need for the imposition of a restriction on internal IRS use of the documents; in any event, that question was not raised here. However, if the district court per-

not apply. Each party shall bear its or his own costs.

REVERSED AND REMANDED.

ceives that such use may have Fifth Amendment implications, it may consider imposing some additional protections for the taxpayer in its order in connection with such use.