**In the Matter of TRADER ROE, a Witness Before the Special January 1989 Grand Jury.**

**No. 89 GJ 25.**

United States District Court, N.D. Illinois, E.D.

Aug. 14, 1989.

Mark Rodert, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Stephen J. Connolly, Connolly, Ekl & Williams, P.C., Clarendon Hills, Ill., for defendant.

### MEMORANDUM DECISION

GRADY, Chief Judge.

The January 1989 Grand Jury is investigating possible violations of federal law by

persons associated with the Chicago Board of Trade. Trader Roe ("Roe"),[1] a member of the Board of Trade, has been subpoenaed by the grand jury to produce his trading cards and any other records of transactions with other traders for the period January 1, 1983 to the present time. He has moved to quash the subpoena on the ground that the compelled production of the records would violate his privilege against self-incrimination.

### "PRIVATE PAPERS"

■ Roe argues that his trading records are "private papers" which enjoy Fifth Amendment protection. He relies upon *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), which is frequently cited by grand jury witnesses who object to producing documents. Roe's motion provides the first occasion we have had for commenting on the "private papers" doctrine in a formal opinion.

We begin the analysis with a discussion of *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), and *United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984), which expressly held that the contents of voluntarily prepared records are not protected by the Fifth Amendment. *Fisher* involved IRS summonses for accountants' papers and other tax records; *Doe* involved a grand jury subpoena for telephone records, bank statements, and business records of various companies. Both *Fisher*, 425 U.S. at 409–10, 96 S.Ct. at 1580, and *Doe*, 465 U.S. at 610–12, 104 S.Ct. at 1240–42, held that, because the Fifth Amendment is addressed only to testimonial compulsion, it does not apply to records that are voluntarily prepared. However, because the documents sought by the government in both of those cases were business records, witnesses frequently argue that *Fisher* and *Doe* did not abrogate the Fifth Amendment protection accorded "private" or "personal" records. The source of this claimed separate protection is the language of the Court in *Boyd*,

to the effect that "... a compulsory production of the private books and papers of the owner of goods sought to be forfeited ... is compelling him to be a witness against himself, within the meaning of the Fifth Amendment to the Constitution." 116 U.S. at 634–35, 6 S.Ct. at 534.

The only paper involved in *Boyd* was an invoice prepared by a seller of plate glass imported into the United States. The government brought a forfeiture action, alleging that the proper duty had not been paid on the glass. The purchaser of the glass, who intervened in the action, was ordered to produce the invoice, failing which the government's allegations would be taken as true. The purchaser produced the invoice, lost the case, and then appealed on the ground that the production order violated his Fifth Amendment privilege. The purchase of thirty-five cases of plate glass is obviously a business transaction, and, just as obviously, the invoice covering the transaction was a business record. Therefore, the language of the *Boyd* court about "private" papers cannot reasonably be interpreted as carving out a privilege for "private" records as distinguished from business records. The actual *holding* of the case—that the invoice was protected by the Fifth Amendment—seems clearly overruled by *Fisher* and *Doe*, which held that the contents of voluntarily prepared records are not covered by the privilege. If the holdings of *Fisher* and *Doe* are more narrowly construed, to mean simply that the *kind* of voluntarily prepared records in those cases—voluntarily prepared *business* records—are not protected, *Fisher* and *Doe* still overrule *Boyd*, since that was the very kind of record involved in *Boyd*.

Another problem with the *Boyd* case is that the invoice was not only voluntarily prepared, but it had been prepared by someone other than the party asserting the privilege. How the contents of the invoice prepared by the glass company could be regarded as compelled testimony by the purchaser of the glass is something the

---

1. We have assigned this fictitious name to the witness so that we will be able to cite this decision in future cases.

Court did not explain. It seems clear the *Boyd* Court thought the mere *possession* of documents gave the possessor a Fifth Amendment privilege as to their contents. Such a proposition is clearly inconsistent with *Fisher* and *Doe*.

Although the Court stated in *Fisher* that "... the prohibition against forcing the production of private papers has long been a rule searching for a rationale consistent with the proscriptions of the Fifth Amendment against compelling a person to give 'testimony' that incriminates him," 425 U.S. at 409, 96 S.Ct. at 1580, and in *Doe* that, "if the party asserting the Fifth Amendment privilege has voluntarily compiled the documents, no compulsion is present and the contents of the document are not privileged," 465 U.S. at 612, 104 S.Ct. at 1242 n. 10, neither decision expressly overruled *Boyd*. While this court is obliged to follow binding Supreme Court precedent, that very obligation requires us to determine whether, in light of *Fisher* and *Doe*, the remarks of the Court in *Boyd* can mean that the contents of personal or private papers, as distinguished from business records, are protected by the Fifth Amendment. We conclude that this would not be a reasonable interpretation of *Boyd*, *Fisher*, and *Doe*, read *together*, and hold that the Fifth Amendment does not protect the contents of any voluntarily prepared records, regardless of their nature.[2]

▪ We suspect the reason for the paucity of cases dealing with genuinely "private" or personal records, such as diaries or personal letters, is that there is rarely an occasion to subpoena documents of that kind. The government is usually in search of documents which will prove tax fraud or some illegal business operation. Records which are strictly "personal" would usually have no relevance to the conduct of a business operation, or to its tax liability. Thus, the "private" papers language of *Boyd* usually does not apply to the facts of cases in which it is invoked; the claim of privilege is defeated simply on the basis that, regardless of the status of private or personal records, business records are not protected. The government suggests that this case could be treated on the same basis, and perhaps it could, but Roe argues that the subpoenaed records, "... if they exist and are in [Roe's] possession, are his own personal 'private' records held by him in an individual capacity," and are thus covered by *Boyd* rather than by *Fisher* and *Doe*. Memorandum In Support of Motion to Quash, p. 9. We do not see how Roe's trading records can be regarded as anything other than business records within the meaning of *Fisher* and *Doe*, nor does Roe offer any inkling as to what distinction he sees. In any event, we hold that the contents of the trading records have no Fifth Amendment protection.

## THE ACT OF PRODUCTION

▪ *Fisher* and *Doe* do, of course, make clear that, although the contents of the records are not protected, there is a privilege as to any testimonial aspects of the act of producing them. The government has offered the usual act of production immunity, but Roe says this is not sufficient to comply with *United States v. Porter*, 711 F.2d 1397, 1404 (7th Cir.1983), where the court noted that:

> the grant of use immunity alone may not be adequate to fully protect Beligratis' Fifth Amendment privilege, for there is nothing in the statutory "use immunity" concept which would prohibit the government's *reference* to (as opposed to evidentiary "use" of) Beligratis' having produced the documents; indeed, permitting such reference is the very advantage that the government obtains in the normal case of witness use immunity.

The court ruled that:

> ... not only must Beligratis be granted statutory use immunity with respect to

---

**2.** This is simply to repeat what Justice O'Connor stated in her concurring opinion in *Doe:*

> [T]he Fifth Amendment provides absolutely no protection for the contents of private papers of any kind. The notion that the Fifth Amendment protects the privacy of papers

originated in *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886), but our decision in *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), sounded the death knell for *Boyd*.

*Doe,* 465 U.S. at 618, 104 S.Ct. at 1245.

these documents, but also the court must fashion a protective order forbidding the government from referring in any way before the grand jury or at trial to the fact that Beligratis produced the documents.

*Id.* We would assume that any order drawn pursuant to the immunity statute would preclude the government from advising the grand jury that Roe has produced the records, since the statute prohibits the use of "testimony or other information compelled under the order (or information directly or indirectly derived from such testimony or other information)...." 18 U.S.C. § 6002. To be safe, however, especially in light of *Porter,* the immunity order should make clear that Roe's act of production is not to be made known to the grand jury. The government indicates that it has no objection to an immunity order which so provides. Government's Memorandum in Opposition to Motion to Quash, pp. 5–6.

■ Finally, Roe argues that, to the extent the subpoena calls for records whose existence is unknown to the government, his act of production would, in effect, be used against him despite the immunity order. He argues that the court should therefore quash the subpoena "... to the extent that the government is unable to prove that, at the time the grand jury's subpoena was served upon him, it had knowledge of the existence, location and authenticity of the documents...." Memorandum in Support, pp. 14–15. In support of this argument, Roe cites the observation of Judge Moran in *United States v. McCollom,* 651 F.Supp. 1217, 1222–23 (N.D.Ill.), *aff'd.,* 815 F.2d 1087 (7th Cir.1987), that "compliance with the subpoena may reveal the existence of accounts currently unknown to the government. Use of any evidence relating to such newly discovered accounts would violate McCollom's immunity...."

In *Fisher,* the Supreme Court noted that compliance with a subpoena "tacitly concedes the existence of the papers demanded and their possession or control by the taxpayer. It would also indicate the taxpayer's belief that the papers are those described in the subpoena." 425 U.S. at 410, 96 S.Ct. at 1580. It is evidence of these "communicative aspects" of the act of production that cannot be used to incriminate the witness. There is a difference between the initial act of surrendering the documents—the act of production—and the later evidentiary use of that act as evidence against the witness. Roe's act of producing the records would provide testimonial evidence of their existence within the meaning of *Fisher* only if that act were *offered in evidence* as proof of the fact. The necessary protection is accomplished by immunizing the witness against the use of any such testimonial aspects of his act of production as evidence against him. It is not accomplished by excusing the act of production altogether, which is what Roe seeks with regard to any records of which the government is not currently aware. To adopt Roe's position would be essentially to hold that there is contents protection for records the government does not know about.

Another difficulty with Roe's argument is that, even where the government knows of the "existence" of documents in the possession of a witness, it may not, and usually will not, know exactly what is in the documents. It may not know, for instance, whether the contents of the documents are in fact incriminating. If they are incriminating, then production would reveal the "existence" of incriminating evidence the government did not know about before. Moreover, the government may know that a witness has possession of documents but may have no idea how many there are. Production of the documents would reveal the "existence" of the exact number, perhaps many more than the government had any idea existed. If a witness can only be compelled to produce incriminating documents of whose contents and number the government has precise knowledge, the rule that the contents of documents are not privileged would be largely academic.

Opining that its use of the contents of subpoenaed documents not previously known to it would "arguably violate the grant of immunity," the government suggests that the way around the problem is for it to demonstrate that it already has knowledge of the existence of those doc-

uments. Government Memorandum, p. 7. To establish that knowledge, the government has filed *ex parte* an affidavit of an FBI agent. The affidavit only illustrates the practical difficulty with Roe's theory. The FBI agent, who worked undercover at the Board of Trade during the period involved in this investigation, states that traders such as Roe used cards to keep running accounts of their illegal trading activities. The agent goes on to describe in some—but not complete—detail one particular such trading card he observed in Roe's possession on a particular date. Perhaps the government does have the requisite "knowledge" of this one particular card to meet the requirement suggested by Roe; but no other trading card is specifically referred to in the affidavit, and it seems clear that the government has no knowledge as to how many cards Roe prepared or what entries they contain. Yet, the grand jury subpoena calls for all trading cards and records of transactions with other traders for a period of more than six years. We do not know how many separate documents this involves, but it could be thousands. Clearly, the affidavit of the FBI agent is insufficient to establish that the government has anything more than a generalized knowledge of the nature of the category of documents it seeks to obtain. When it actually obtains the documents from Roe and examines their contents, it will probably learn considerably more than it now knows. The difference will be the result of Roe's act of production. To paraphrase *McCollom,* the records "may reveal the existence of [transactions] currently unknown to the government." But we believe a complete answer to any Fifth Amendment objection to this process is that the government will not be able to offer in evidence at any time the fact that it obtained these documents from Roe.

The motion to quash the subpoena is denied. The matter will be set for a conference in chambers to discuss the language of the proposed immunity order.