**In re SIX GRAND JURY WITNESSES.**

**UNITED STATES of America, Appellee,**

v.

**John DOE # 1; John Doe # 3; John Doe # 5; John Doe # 6, Respondents–Appellants,**

**Richard Roe; XYZ Corporation, Intervenors–Appellants.**

**Nos. 333, 334, 335, 336, Dockets 92–6147, 92–6149, 92–6151, 92–6157.**

United States Court of Appeals, Second Circuit.

Argued Sept. 2, 1992.

Decided Nov. 19, 1992.

Peter J. Romatowski, Washington, D.C. (Clifton S. Elgarten, Cary H. Plamondon, Crowell & Moring, Washington, D.C.; Vincenti & Schickler, New York City, of counsel), for appellant XYZ Corp.

Herald Price Fahringer, New York City (Diarmuid White, Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, of counsel), for appellant Richard Roe.

Peter J. Tomao, Asst. U.S. Atty. for the Eastern District of New York (Andrew J. Maloney, U.S. Atty., Peter A. Norling, Emily Berger, Charles S. Kleinberg, Asst. U.S. Attys. for the Eastern District of New York, of counsel), for appellee U.S.

John F. Kaley, Weinberg, Kaley & Pergament, P.C., Garden City, N.Y., of counsel; James O. Druker, Kase & Druker, Garden City, N.Y., of counsel, filed a joint brief for respondents-appellants John Doe # 1, John Doe # 3, John Doe # 5, John Doe # 6.

Before FEINBERG, NEWMAN, and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

Believing it had been deliberately defrauded by a subcontractor under a government contract, the United States commenced a criminal investigation and summoned several company employees to testify before a grand jury. When the contractor corporation learned it was the target of a criminal investigation it retained counsel, consulted with company officials and implemented an approach to evaluating the work performed that it believed would demonstrate that the government had received fair value for the equipment furnished. The employees responsible for monitoring the costs on the subject government project and who performed the analysis for defense counsel are the ones called before the grand jury. Their refusal to answer certain questions based on their corporate employer's assertion of the attorney-client privilege and the attorney's work product privilege precipitated this appeal.

Squarely presented for reconciliation are the seemingly conflicting interests of disclosure and secrecy. Discovery, designed to advance the pursuit of truth, takes the "sporting" element out of litigation by eliminating surprise. The inviolability of confidential communications between attorney and client and the protected privacy of the attorney's work product also contribute to the efficient functioning of the adversarial system's search for truth. Each ceases to be a privilege when it ceases to be a secret. The question before us asks to what extent may the prosecution obtain access to information defendant counsel alleges it has gathered; or, to phrase it another way, may these employees be compelled—despite the company's assertion of the two privileges—to testify before the grand jury with respect to their activities. With a few exceptions, we think they may be so compelled.

## FACTS

The facts in this case are straightforward and undisputed. XYZ Corporation designs and builds timing devices for, among other uses, navigating satellites. A grand jury in the Eastern District of New York is investigating allegations that XYZ and its president, Richard Roe, conspired to defraud the United States in violation of 18 U.S.C. §§ 286 and 371 and committed major fraud against the United States in violation of § 1031 by submitting claims containing false statements in violation of § 1001. The investigation concerns XYZ's performance under contracts to design and build a frequency source amplifier, a voltage controlled crystal oscillator, a frequency multiplier power amplifier, a calibration upconverter, a reference generator unit, and a surface acoustic wave oscillator. The government believes XYZ illegally inflated its costs when submitting vouchers for work performed as a subcontractor on contracts called the "Fox" contracts that XYZ had with a prime government contractor producing this sophisticated space equipment.

The investigation of XYZ for making false and inflated claims for payment under the Fox contracts started after "stop work" orders were issued in February

1988. Subsequently, certain of the Fox contracts were terminated altogether; others were renegotiated and continued on a reduced scale. XYZ's payment claims relate to the work it performed up to the date of the stop-work orders. It also made proposals on the reconfigured continuing contracts. The government alleges that XYZ created false books and records in support of its termination payment claims and proposals and that its original corporate records on these contracts were either destroyed or discarded. At the commencement of its investigation in 1990 the government obtained two broad search warrants and a subpoena for "all documents related to the Fox contracts," resulting in its gathering truckloads of documents from XYZ amounting to at least 170 boxes of corporate records.

XYZ retained counsel to represent it in connection with the investigation. In January 1991 defense counsel requested that an analysis of costs be made by certain high-ranking employees—John Does #1 through #6. These employees were engineering manager, program manager, microwave systems manager, director of marketing, program administrator, and vice-president of systems engineering, respectively. As such, they were the employees responsible for monitoring XYZ's costs and were familiar with the Fox contracts. In conducting their analysis each of them chose what documents they would review. In early 1992 all six employees appeared before the grand jury.

During the course of their grand jury testimony John Does #1, #3, #5 and #6 refused to answer questions with respect to the analysis they had made of the Fox contracts because this work had been done at the direction of XYZ's counsel. The witnesses read a statement setting forth their understanding that the corporation was asserting the confidentiality of the attorney-client privilege with respect to the witnesses' communication with defense counsel and also the confidentiality under the work product privilege of "all information and materials generated" at the direction of counsel.

On January 27, 1992 counsel for the John Doe witnesses advised XYZ's counsel that in pre-grand jury interviews the government prosecutor had questioned them about communications with XYZ's counsel. Defense counsel thereupon suggested that the witnesses be shown documents of the government's own choosing and be asked to analyze them without reference to the analysis the witnesses had previously conducted for the defense. In rebuffing this approach, the prosecutor explained that this procedure would not elicit the witnesses' opinions regarding which of the government documents would be relevant to determine the costs incurred under the Fox contracts.

On March 10, 1992 the government obtained a show cause order as to why John Does #1 through #6 should not be held in contempt for refusing to answer certain questions before the grand jury. The actions against John Does #2 and #4 were later discontinued because they were not asked any disputed questions. The unanswered questions, further questions intended to be asked when the witnesses were recalled, and additional questions outlined in the government's trial brief of May 4, 1992 were submitted to defense counsel. All of these questions were collected and submitted to us after oral argument in a letter dated Sept. 3, 1992 from Assistant U.S. Attorney Peter J. Tomao. The 23 unanswered questions are set forth and attached to this opinion as Appendix A.

After conducting an *in camera* review of the witnesses' analyses, the district court issued an order dated June 8, 1992 directing the witnesses to respond to the questions. This direction was based on the trial court's finding that the information sought by the prosecutor was limited to underlying facts and that the witnesses' responses would not infringe on either of the privileges XYZ Corporation had asserted so long as—the district court carefully added—the questions were not connected to or identified with the analyses the witnesses had conducted at the request of defense counsel. From this order John Does #1, 3, 5 and 6, XYZ Corporation and Richard Roe,

its president, appeal. On June 23, 1992 we granted a motion to expedite this appeal.

## DISCUSSION

Appellants contend that they may rightfully refuse to answer the questions set forth in Appendix A because the information gathered in the employees' analysis is protected by the attorney-client privilege, and that absent a waiver, the prosecutor has no right to discover the communications of these analyses to defense counsel no matter how great the need. Appellants also assert this information is immune from grand jury inquiry under the attorney's work product doctrine. Specifically, they assert that these privileges protect the "substance" of the work product, not simply the written analysis, which the government concedes it is not entitled to. The government responds that the information it seeks is limited to underlying facts and opinions relating to the "Fox" contracts within the knowledge of these witnesses and that it is entitled to their testimony before the grand jury because neither the attorney-client privilege nor the work product doctrine protects the requested information. We discuss each of these privileges in general and then in the context of the questions asked of the John Doe witnesses in this case.

### I *Attorney–Client Privilege*

■ Fed.R.Civ.P. 26 permits discovery of any relevant matter not subject to privilege. All agree that the rules of discovery are to be applied broadly, but that according the discovery rules liberal treatment does not license opposing counsel to discover anything and everything. Limitations are imposed on discovery sought in bad faith, to harass or oppress the party subject to it, when it is irrelevant, or when the examination is on matters protected by a recognized privilege. *See Hickman v. Taylor*, 329 U.S. 495, 507–08, 67 S.Ct. 385, 391–92, 91 L.Ed. 451 (1947). As Fed.R.Evid. 501 states:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

One of the privileges recognized in Rule 501 is the attorney-client privilege. It is, according to Professor Wigmore, the oldest of the common law privileges dating back to the early 16th century, 8 John H. Wigmore, *On Evidence* § 2290 (McNaughton rev. ed. 1961), and has encouraged clients to confide in their attorneys fully and frankly, free from the apprehension of disclosure, for nearly 500 years.

■ The privilege began as an exception to the testimonial compulsion for every witness' evidence. Generally, all relevant proof is essential if determinations by the fact finder are to be made on a complete trial record. Absent full disclosure of all the relevant facts, confidence in the fair administration of justice would cease to exist. *See United States v. Nixon*, 418 U.S. 683, 709, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974). Because the attorney-client privilege remains an exception that may withhold relevant information at the pre-trial or the trial stage of a criminal prosecution or civil proceeding, it may be invoked to hold secret only those communications made in confidence to a lawyer to obtain legal counsel that would not have been made without the existence of the privilege. *See Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976); *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir.1961) (Friendly, J.).

■ We recognize that the availability of advice from an attorney is essential if corporations are to comply with the ever-increasing complexities of federal law; and, if that advice is to be sought and given there must be predictable certainty as to which communications will be protected. *See In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1036–37 (2d Cir.1984). Where the

client is a corporation, as here, the privilege extends to communications between a lawyer and his or her client—both information provided to the lawyer by the client and professional advice given by an attorney that discloses such information. *See Upjohn Co. v. United States,* 449 U.S. 383, 390, 101 S.Ct. 677, 683, 66 L.Ed.2d 584 (1981). Yet, the cloak of the privilege simply protects the communication from discovery, the underlying information contained in the communication is not shielded from discovery.

## II  *Work Product Privilege*

Whether the work product of counsel gathered and devised in preparation for litigation, such as facts, legal contentions or trial tactics, may be discovered is a highly controversial area of the law, as this case illustrates. The boundaries of the doctrine are far from fixed. *See Special Project, The Work Product Doctrine,* 68 Cornell L.Rev. 760, 762 (1983). The leading Supreme Court case, *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), sheds some light on the issues raised here. There defendant's counsel obtained written and oral statements from witnesses in preparation for trial. When plaintiff's counsel sought copies of the statements and a detailed synopsis of the oral statements to examine these witnesses, the Court held that absent a showing of need the statements were protected from discovery as work product of the lawyer. *Id.* at 510, 67 S.Ct. at 393.

■ From that holding, it can be gleaned that the work product doctrine provides a zone of privacy for a lawyer; the doctrine grants counsel an opportunity to think or prepare a client's case without fear of intrusion by an adversary. *See United States v. Nobles,* 422 U.S. 225, 238, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975). While unwarranted questions probing the attorney's files and theory of the case are barred in criminal as well as civil litigation, *see id.* at 238 n. 12, 95 S.Ct. at 2170 n. 12, relevant, non-privileged facts may be discovered from an attorney's files where their production is essential to the opponent's preparation of its case. *See Hickman,* 329 U.S. at 511, 67 S.Ct. at 393. And, in *Nobles,* the Supreme Court ruled the privilege was not available to prevent disclosure of a defense investigator's report that attacked the credibility of a key prosecution witness, reasoning that once defense counsel elected to produce the investigator as a witness the privilege was waived. 422 U.S. at 239, 95 S.Ct. at 2170.

■ Both common law principles embodied in the attorney-client privilege and the work product doctrine are to be applied in a common sense way in light of reason and experience as determined on a case-by-case basis. *See* Fed.R.Evid. 501; *In re Grand Jury Subpoena Dated Jan. 4, 1984,* 750 F.2d 223, 224 (2d Cir.1984). We now proceed to analyze the present questions on that basis by examining the pertinent factors in this case.

## III  *Privileges With Respect to Present Grand Jury Questions*

Subsequent to the John Does' grand jury appearances, a number of the questions that had not been answered before the grand jury were, in effect, answered in April 1992 affidavits sworn to by several of the John Doe witnesses. These affidavits appeared to have been submitted to show that the direction for the analysis had come from defense counsel and that information thereby gathered was to be turned over to defense counsel and kept confidential. As in *Nobles,* once the questions were answered for defense counsel's purposes, their contents were available for the prosecution's use. *See* 422 U.S. at 239, 95 S.Ct. at 2170. Those questions that have already been answered therefore are not listed in Appendix A.

We turn to the pending questions. To begin with it seems plain that merely by asking witnesses to conduct an analysis defense counsel may not thereby silence all the key witnesses on the cost aspects of the Fox contracts under either claim of privilege. Were counsel to succeed in such a tactic, the government would never be able to conduct a full and complete investigation of an alleged crime because the criti-

cal witnesses would have been effectively silenced, nor for the same reason would the government be able to present all the evidence at trial regarding a defendant's guilt or innocence.

■ Examining the 23 questions we see no trampling of either privilege, except in four questions. Question # 8 "With whom did you discuss this analysis," # 9 "What was said [other than to counsel]," # 14 "What information did you give them [anyone other than [XYZ's] attorney]," and question # 15 "When did you give this information to anyone other than [XYZ's] attorney." The form of these four questions, considered in sequence, risks violation of the attorney-client privilege because the witness, in responding, might be understood to be implying to the grand jury that he had conveyed privileged information to the lawyer. Appellee's efforts now to include bracketed exclusions of communications to counsel minimize the risk, but a rephrasing of the questions is preferable to avoid suggesting that the witness is being asked about any aspect of any communication he might have had with the lawyer.

■ Although an attorney-client communication is privileged and may not be divulged, see *Fisher*, 425 U.S. at 403, 96 S.Ct. at 1577, the underlying information or substance of the communication is not, as appellants incorrectly believe, so privileged. Further, the remaining 19 questions seek underlying factual information to which the prosecutor is clearly entitled. The factual information is not protected by the attorney-client privilege just because the information was developed in anticipation of litigation.

■ Moreover, the affidavits examined by the district court *in camera* undercut appellants' assertion regarding the privileged nature of much of the information as attorney's work product. For example, the affidavits contain identical paragraphs and emphasize that the assignment required the witness to make "judgments" and "estimates" and that the results embodied the witness' "mental impressions," all of which concededly are privileged aspects of work product. But nowhere in the affidavits do appellants clarify what those judgments or mental impressions were—even in a very general manner. In fact, the attachments to the affidavits appear to be nothing but straightforward calculations from raw data, making it difficult to imagine what "mental impressions" were involved.

As a consequence, there is no common law privilege barring the government from obtaining answers to these 19 questions from the John Doe witnesses.

## CONCLUSION

The district court's order compelling John Doe witnesses # 1, # 3, # 5, and # 6 to answer certain listed questions is modified by striking questions # 8, # 9, # 14, and # 15 and, as modified, the order is in all other respects affirmed.

## APPENDIX A

I. QUESTIONS WHICH WITNESSES REFUSED TO ANSWER ON THE GROUNDS OF PRIVILEGE BEFORE THE GRAND JURY SET OUT IN LETTER FROM PETER J. TOMAO, DATED MARCH 17, 1992 (A 56–60).

1. Q. (With regard to an analysis of the status of the documentation on project 11369 and 11370 as of the time of the stop work order) what did you do?

2. Q. Are you prepared to tell us at this time what analysis you performed (on the Fox contracts)?

3. Q. (With regard to subsequent analysis performed on the Fox contracts) [W]hat analysis did you conduct?

4. Q. [W]hat reviews of the Fox contracts did you conduct?

5. Q. (With regard to the initial analysis performed on the Fox contracts) Do you have any reason as you sit here today to say whether or not these were accurate?

6. Q. (With regard to a study conducted after July 1988) Are you able to tell us what that study was?

II. ADDITIONAL QUESTIONS SET FORTH IN PETER J. TOMAO'S LETTER DATED MARCH 17, 1992.

A. Have you made an effort to determine the total number of labor hours and/or amount of labor costs which were incurred in connection with the Fox contracts?

7. Q. If so, what analysis did you perform?

8. Q. With whom did you discuss this analysis?

9. Q. What was said [other than to counsel]?

10. Q. What records did you review?

11. Q. What information did they give you?

12. Q. When did they give you that information?

13. Q. What conclusions did you draw?

14. Q. What information did you give them [anyone other than XYZ's attorney]?

15. Q. When did you give this information to them [anyone other than XYZ's attorney]?

B. Have you determined that additional hours were worked and/or costs were incurred on the Fox contracts which were not reflected in the original XYZ time sheets and other records?

16. Q. If so, how many or how much?

C. Do you have an opinion as to whether additional hours were worked and/or costs were incurred on the Fox contracts which were not reflected in the original XYZ time sheets and other records?

17. Q. If so, how many or how much?

III. QUESTIONS SET FORTH IN DECLARATION OF CHARLES S. KLEINBERG DATED MAY 4, 1992 (A 198–99).

18. Q. What documents would you need to review to estimate the total labor and other costs incurred by XYZ in connection with the Fox contracts prior to termination?

19. Q. What questions would you need answers to in order to estimate the total labor and other costs incurred by XYZ in connection with the Fox contracts prior to termination?

20. Q. From whom would you need to get these answers?

21. Q. [the questions identified in answer to (18) and (19)]

22. Q. Estimate the total labor hours and labor costs incurred by XYZ in connection with the Fox contracts prior to termination?

23. Q. Estimate the total costs incurred by XYZ in connection with the Fox contracts prior to termination?